# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01679-SCT

*CHRISTINE LAURALENE WOODELL AND
CARROLL DEAN WOODELL*

*v.*

*HENRY PARKER AND BARBARA PARKER*


| | |
|---|---|
| DATE OF JUDGMENT: | 9/26/2001 |
| TRIAL JUDGE: | HON. THOMAS WRIGHT TEEL |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | WOODROW W. PRINGLE, III |
| ATTORNEY FOR APPELLEES: | WALTER L. NIXON, JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 12/04/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


### EN BANC

### GRAVES, JUSTICE, FOR THE COURT:

¶1.     Christine Lauralene Woodell and Carroll Dean Woodell seek review of the ruling of the Harrison County Chancery Court, Second Judicial District, which granted the petition of Henry and Barbara Parker for grandparent visitation.  The chancellor determined that Henry and Barbara Parker had a viable relationship with their granddaughter, that the Parkers had been unreasonably denied visitation rights, and that it was in the best interest of the grandchild to have contact with the Parkers.  The Woodells appeal this ruling.  We affirm  the judgment of the chancellor.

### FACTS

¶2.    Shelby Marie Woodell ("Shelby") was born on May 29, 1995, to Laura Christine Woodell ("Laura") and John Andrew Parker ("Andy") who were not married. Laura was 18 years old and had just recently graduated from high school when Shelby was born. Andy was 20 years old. Both Laura and Andy, who had dated for three years, lived at home with their parents.

¶3.    Three days after Shelby's birth, Laura's parents, Carroll and Christine Woodell ("Woodells"), filed a petition for adoption. Laura and Andy each signed a consent, waiver of process and joinder; an affidavit of surrender and consent; and an additional affidavit which stated in part the consents and surrenders were irrevocable.[1]  The adoption order was filed on June 19, 1995.  Henry and Barbara Parker ("Parkers"), Andy's parents, were not made aware of the adoption until months later.

¶4.    After the adoption, Laura and Shelby continued to live with her parents, and Andy continued to live with his parents.  Laura and Andy both spent time with Shelby.  Andy and his parents sent money to the Woodells for Shelby.  At least six cashed checks from 1997 are contained in the record which substantiate the Parkers' claims that they provided financial support to Shelby.  However, eventually Mrs. Woodell refused to cash their checks.  The Parkers also kept Shelby during the day while Laura attended community college.  Early in life, Shelby had an established relationship with the Parkers.  Laura even sent the Parkers birthday cards from Shelby in 1996 and 1997.   Both Andy and his parents were allowed visitation and overnight visits with Shelby.

¶5.    Ultimately, the relationship between Laura and Andy deteriorated, and the visits with the Parkers were restricted.  Around Shelby's third birthday, the Woodells began refusing both Andy and his parents visitation.  At first, the Woodells provided what seemed to be legitimate excuses as to why Shelby could

[1]  Although not relevant to this appeal, Shelby was born with medical problems which Andy and the Parkers claim prompted the adoption.  Andy claims that the adoption was primarily based on Shelby's need for medical insurance which the Woodells were capable of providing.

2

not come for visits. To quote Mrs. Woodell, Shelby was a "busy girl." However, after repeated refusals by the Woodells to allow either Andy or the Parkers visitation, it became clear that the Woodells were in fact attempting to shut them out of Shelby's life. Eventually, the Parkers were totally denied visitation after Shelby's fourth birthday. The Parkers attempted to reason and negotiate with the Woodells to obtain visitation but their efforts were unsuccessful.

¶6. On March 5, 1999, the Parkers, as the biological paternal grandparents, filed a petition for grandparents' visitation. The Woodells filed a motion to dismiss the action and for attorney fees. Attached to their motion were the adoption pleadings which indicated the Woodells' adoption of the minor child of their daughter, Laura, and the Parkers' son, Andy. The Woodells argued that as the "adoptive parents" of Shelby they had a fundamental right to choose with whom their granddaughter spent time and until proof was shown that they were unfit parents, the Courts could not take this right away from them. The chancellor denied the Woodells' motion to dismiss.

¶7. Thereafter, the Woodells filed a second motion to dismiss on September 20, 2001, on the grounds that the Mississippi Grandparents' Visitation Statute was unconstitutional. This motion was filed the Friday before the case was set to go to trial on Monday. The Parkers filed a motion to strike on the grounds that the motion was untimely and in derogation of the chancellor's previous order.

¶8. A hearing was held on September 24, 2001, where the chancellor heard arguments on the motion to dismiss, the motion to strike and the merits of the petition for visitation. Testimony at the hearing revealed:

(1) The Parkers were not aware of the adoption until months after its completion;

3

(2) The Parkers kept Shelby during the day while Laura attended school and kept Shelby overnight on several occasions;[2]

(3) Laura sent the Parkers birthday cards from Shelby;

(4) The Parkers gave Shelby gifts for birthdays and other holidays;[3]

(5) Mrs. Woodell acknowledged that the Parkers had sent financial support to Shelby, but that she did not cash most of the checks;

(6) On at least one occasion, Mrs. Woodell discussed with Mr. Parker their refusal to allow visitation;

(7) Mrs. Woodell acknowledged that Laura's feelings toward Andy with regard to the deterioration of their relationship did play a role in the determination to refuse visitation;

(8) The reasons cited by Mrs. Woodell with regard to why she believed it was not in the best interest of Shelby to visit with the Parkers included Mr. Parker's gun collection; the confusion such visitations would cause Shelby; Shelby having ridden, on a four wheeler with Mr. Parker at their family farm; the Parkers judgments with regard to Shelby may differ from her own; and six- year- old Shelby is a "busy girl;"

(9) The Parkers testified that if given visitation they would not undermine the Woodells' discipline of Shelby or the principles by which they require her to abide;

(10) The guns which the Parkers have in their home are antique collectibles which are locked in gun safes. The Parkers have also agreed that if requested, they would remove the guns from their home in order to reassure the Woodells;

(11) The Woodells are currently separated and living apart;

(12) Since Mrs. Woodell's apartment flooded, Laura has been primarily keeping Shelby;

(13) Laura has married and as of the hearing was expecting another child;

(14) Shelby calls Laura "mom," Andy "dad," the Woodells "grandpa and grandma," the Parkers "grandma and grandpa," and Laura's new husband "Mark and/or Dad;"

(15) The Parkers only live fourteen miles away from the Woodells and Laura;
and

(16) The Parkers have eight other grandchildren besides Shelby and all are girls.

¶9.     On September 26, 2001, the chancellor entered an order granting the Parkers' petition for grandparent visitation. The chancellor found the Parkers qualified for visitation rights under Miss. Code Ann. § 93-16-3(2) because they had established a viable relationship with Shelby, they had been

---

[2]There was contradictory testimony as to whether the Parkers had overnight visits with Shelby. However, the chancellor found that the Parkers had in fact kept Shelby overnight on several occasions.

[3]There was contradictory testimony as to whether the Parkers gave Shelby gifts. The Woodells believe all the gifts given to Shelby came from Andy. However, both Andy and the Parkers assert that many of the gifts given to Shelby were from the Parkers.

4

unreasonably denied visitation, and it was in Shelby's best interest to maintain contact with the Parkers. The chancellor applied the *Martin*[2] factors and ordered that the Parkers would have visitation with Shelby one weekend per month, every other Spring Break/Easter holiday, two weeks every summer, the Friday and Saturday following Thanksgiving and the four days after Christmas. From this judgment, the Woodells appeal.

## DISCUSSION

¶10. This Court employs a limited standard of review in reviewing the decisions of a chancellor. *Reddell v. Reddell*, 696 So. 2d 287, 288 (Miss. 1997). The findings of a chancellor will not be disturbed unless this Court finds the chancellor abused his discretion, was manifestly wrong or made a finding which was clearly erroneous. *Bank of Miss. v. Hollingsworth*, 609 So.2d 422, 424 (Miss. 1992). Additionally, deference is also given to the trial court's determinations as to the weight and credibility of witnesses when there is conflicting testimony. *See Scott Addison Constr., Inc. v. Lauderdale County Sch. Sys.*, 789 So.2d 771, 773-74 (Miss. 2001); *Murphy v. Murphy*, 631 So.2d 812, 815 (Miss. 1994); *Culbreath v. Johnson*, 427 So.2d 705, 708 (Miss. 1983).

¶11. As for questions of law, the standard of review is de novo. *Zeman v. Stanford*, 789 So. 2d 798, 802 (Miss. 2001). *See also Consolidated Pipe & Supply Co. v. Colter*, 735 So. 2d 958, 961 (Miss. 1999); *Harrison County v. City of Gulfport*, 557 So. 2d 780, 784 (Miss. 1990).

    I.    WHETHER MISS. CODE ANN. § 93-16-3 (1994) IS
          CONSTITUTIONAL AND CONFLICTS WITH OTHER
          STATUTORY PROVISIONS.

¶12. The Woodells argue that the Mississippi Grandparents' Visitation Rights Statute

---

[2]*Martin v. Coop*, 693 So. 2d 912, 916 (Miss. 1997).

5

is unconstitutional under ***Troxel v. Granville***, 530 U.S. 57, 120 S.Ct. 2054, 147 L. Ed. 2d 49 (2000). This Court finds that this issue has already been addressed in ***Stacy v. Ross***, 798 So.2d 1275 (Miss. 2001).

¶13.     In ***Stacy***, we held that the Mississippi Grandparents' Visitation Rights Statute was constitutional even under the United States Supreme Court's holding in ***Troxel***. As we have already specifically rejected the Woodells' arguments in ***Stacy***, this issue is without merit.

**II.     WHETHER UNDER MISS. CODE ANN. §§ 93-16-3(2) & (3) THE PARKERS FAILED TO ESTABLISH A VIABLE RELATIONSHIP OR THAT THEY WERE UNREASONABLY DENIED GRANDPARENTS' VISITATION RIGHTS.**

¶14.     The Woodells argue that the Parkers failed to show that they had established a viable relationship with Shelby or that they were unreasonably denied grandparents' visitation rights under Miss. Code Ann. § 93-16-3(2) and (3).

¶15.     Any rights the Parkers hold with regard to visitation with Shelby is statutory.  The Mississippi Grandparents' Visitation Rights Statutes, Miss. Code Ann. §§ 93-16-1 to 93-16-7, provide grandparents with visitation rights under certain circumstances.  Without question, the Parkers have met the criteria for invoking the statute as provided for in Sections 93-16-3 and 93-16-7.  However, the question then becomes, whether the Parkers have met the applicable criteria and factors required for obtaining visitation which are provided for in Section 93-16-3 (2) and (3).  Section 93-16-3 provides, in relevant part,:

> (2) Any grandparent who is not authorized to petition for visitation rights pursuant to subsection (1) of this section may petition the chancery court and seek visitation rights with his or her grandchild, and the court may grant visitation rights to the grandparent, provided the court finds:

> (a) That the grandparent of the child had established a **viable relationship with the child** and the parent or custodian of the child **unreasonably denied the grandparent visitation rights** with the child; and
> (b) That visitation rights of the grandparent with the child would be in **the best interests of the child**.
>
> (3) For purposes of subsection (3) of this section, the term **"viable relationship" means** a relationship in which the grandparents or either of them have **voluntarily and in good faith supported the child financially in whole or in part for a period of not less than six (6) months before filing any petition for visitation rights with the child** *OR* **the grandparents have had frequent visitation including occasional overnight visitation with said child for a period of not less than one (1) year**.

Miss. Code Ann. § 93-16-3 (2) & (3) (emphasis added).

¶16.    The record indicates that the Parkers have established a viable relationship with Shelby. The Parkers had consistent and frequent visitation, including overnight visits, with Shelby for at least the first three years of her life. Also, the Parkers kept Shelby during the day while Laura attended school. The only impediment preventing the Parkers from having visitation with Shelby since her fourth birthday has been the Woodells' refusal to allow such visitation.

¶17.    Despite the Woodells' contentions; the statute does not require that "frequent visitation . . . of not less than one (1) year" to have occurred the year directly prior to the filing of the petition. The statute only requires "frequent visitation . . . of not less than one (1) year," and in this case, the Parkers have proven frequent visitation for at least three years.

¶18.    Evidence at the hearing also showed that the Parkers have provided financial support for Shelby. During the year of 1997, at least six of the Parkers' checks were cashed by the Woodells which provided support for Shelby and extra money to place in her savings account. The Woodells eventually refused to cash any more checks sent to them by the Parkers. The Parkers also bought Shelby gifts, toys, and necessaries for her to have at their home when she came to visit.

¶19.    The record also indicates that the Parkers have been unreasonably denied grandparents' visitation rights by the Woodells. Despite the Woodells' argument that visitation with the Parkers was only incidental to Andy's visitation, the record shows that not only did Andy enjoy visitation with Shelby, but the Parkers also exercised visitation with Shelby independent of Andy's visitation. Separate from Andy's visitations, the Parkers were allowed visitation and overnight visits with Shelby until sometime around her fourth birthday.

¶20.    We conclude that the chancellor correctly found the Parkers to have a viable relationship with Shelby and that they were unreasonably denied visitation by the Woodells.[3]

### III.    WHETHER THE CHANCELLOR ERRED IN FAILING TO GIVE ANY CONSIDERATION TO THE WOODELLS' DETERMINATION OF WHAT WAS IN THE BEST INTEREST OF THE CHILD.

¶21.    The Woodells argue that the chancellor did not give sufficient consideration as to their opinion of what is in the best interest of Shelby. The majority of their argument relies on *Troxel* and *Stacy* for the proposition that the custodial parents are in the best position to determine what is in the best interest of their child, therefore, they that contend great deference should be given to their opinion in this regard and some finding with regard to their fitness as a parent must be shown in order for visitation to be granted.

¶22.    At the onset, it must be noted that Section 93-16-3(2)(b) requires the trial court in determining whether grandparents visitation should be granted to assess whether "visitation rights of the grandparent with the child would be in the best interest of the child." Miss. Code Ann. § 93-16-3(b)(2). There is no language in the statute suggesting that the custodial parent's opinion with regard to what is "in the best interest of the child" is to receive some sort of "deference" or that findings as to the fitness of a parent are

---

[3] At this time, there is no need to discuss the validity of the adoption and the contentions of the Parkers as to the court's failure to appoint Andy a guardian ad litem and their failure to receive process with regard to the adoption. Such a discussion is not necessary for an analysis of the issues presented.

to be made. However, under applicable case law, we find that "deference" is afforded to the opinion of a "natural parent" involved in a visitation dispute under this nature.

¶23. Returning to the Woodells' arguments with regard to *Troxel* and *Stacy* a full reading of the applicable case law leads to the conclusion that neither case stands for the proposition that "adoptive parents" under the present circumstances receive deference with regards to their "opinion" that visitation would not be in the best interest of the child or that the custodial parent must be found to be unfit before visitation is proper. These cases and their holdings do not support the arguments made by the Woodells.

¶24. In *Troxel*, the paternal grandparents sought visitation from the natural mother of the child. 530 U.S. 57, 120 S.Ct. 2054. The Troxels were the parents of Brad Troxel and the paternal grandparents of Isabelle and Natalie Troxel. *Id.* at 60, 120 S.Ct. at 2057. After the death of their son, the Troxels continued to have regular visitation with the children. *Id.* Sometime thereafter, Tommie Troxel, the children's mother, explained to the Troxels that she wanted to "limit their visitation." *Id.* at 61, 120 S.Ct. at 2057. The Troxels then commenced suit seeking grandparents visitation under a Washington Statute. *Id.* After a lengthy court battle, the case came before the United States Supreme Court on review. *Id.* at 61-63, 120 S.Ct. at 2057-59. The United States Supreme Court affirmed the Washington Supreme Court's holding that the Washington statute allowing for grandparents' visitation was unconstitutional. *Id.* at 63, 120 S.Ct. at 2058-59. In so finding, the Court placed much emphasis on the fundamental liberty interest of parents in the care, custody, and control of their children. *Id.* at 65, 120 S.Ct. at 2060.

¶25. In *Stacy*, the maternal grandparents sought visitation from the natural parents of the child. 798 So.2d 1275. The Rosses were the parents of Sandy Stacy ("Stacys") and the maternal grandparents of

Kevin Stacy ("Kevin"). *Id.* at 1276. We reversed the trial court's grant of unsupervised visitation and overnight visits in favor of the Rosses. *Id.* at 1284. However, our finding was primarily based on the following:

1. The Stacys were the natural parents of Kevin;
2. The Stacys stipulated from the onset of the lawsuit that the Rosses have a viable relationship with Kevin and they did not intend to permanently deny visitation to them;
3. The Stacys conceded that they were willing to work with the Rosses and afford them "some" visitation with Kevin; and
4. The Stacys as natural parents enjoy a presumption in their favor as to their judgments with regards to how much time is appropriate for Kevin to spend with his grandparents.

*Id.* at 1279-82.

¶26. The most compelling differences between the cases presented above and the present case are the facts and circumstances surrounding the relationships among the parties. Unlike the "parent" defendants above, the Woodells are not the "natural parents" of Shelby. They are the adoptive parents of Shelby. Unlike the cases above, at least one of the "natural parents" of Shelby are still involved in her life and have maintained visitation with her throughout her life. In fact, Shelby calls her biological mother "mom;" her biological father "dad;" and her maternal and paternal grandparents "grandma and grandpa." Shelby does not refer to Mrs. Woodell as "mom," because Shelby knows that her real mother is Laura; just as she knows that her grandparents are the Parkers. Unlike the natural parents in the cases above, the Woodells have completely and totally denied the Parkers visitation. Even in *Troxel* and *Stacy*, the "natural parents" conceded to affording the grandparents visitation and only wished to limit visitation; not like the Woodells who have chosen to deny visitation in its entirety.

¶27. Although we have deferred to the opinions and judgments of "natural parents" when it concerns the amount of visitation to be afforded grandparents, we have not provided that "custodial adoptive

10

grandparents", such as the Woodells, should be afforded the same presumptions under the grandparents' visitation rights statutes. Despite the fact that the Woodells are the "adoptive parents" of Shelby, Shelby is not being misled to believe that they are her natural parents. Shelby is aware that they are her maternal grandparents, that Andy is her father, that Laura is her mother and that the Parkers are her paternal grandparents. Under the circumstances, the Woodells may be "custodial parents" by way of adoption, but they are not Shelby's "natural parents." Any deference that may be afforded the Woodells cannot necessarily be said to supersede the findings of the chancellor that it is in the best interest of Shelby to remain in close contact with her paternal grandparents.

¶28.    In *Martin*, this Court stated that "the best interest of the child must be the polestar consideration." 693 So.2d at 916. We also found that "[t]he visitation should be less than that which would be awarded to a non-custodial parent, unless the circumstances overwhelming dictate that the amount of visitation is in the best interest of the child, and it would be harmful to the child not to grant it." *Id.* Then, we provided a list of ten factors to be used in determining grandparent visitation:

1. The amount of disruption that extensive visitation will have on the child's life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time.
2. The suitability of the grandparents' home with respect to the amount of supervision received by the child.
3. The age of the child.
4. The age, and physical and mental health of the grandparents.
5. The emotional ties between the grandparents and the grandchild.
6. The moral fitness of the grandparents.
7. The distance of the grandparents' home from the child's home.
8. Any undermining of the parent's general discipline of the child.
9. Employment of the grandparents and the responsibilities associated with that employment.
10. The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent's manner of child rearing is not to be interfered with by the grandparents.

11

*Id.*

¶29.    In assessing and determining the visitation rights of the Parkers the chancellor used the above enumerated factors and made specific findings of fact with regard to each.  In fact, the Woodells do not contest these findings but merely assert that visitation is not in the best interest of Shelby and is excessive. The chancellor's findings with regard to each factor were  as follows:

> (1) Visitation will not unduly disrupt Shelby's life.  Currently, Shelby has nightly visitation with Laura, her biological mother, but still her legal sister.  Periodic visitation by the grandparents would not be near this disruptive.  The Woodells offered no other complexities, other than general family life, that would be burdened by visitation.
> (2) The Parker home is suitable.  The Parkers have a home, 70 acres, with other children and some of their nine grandchildren nearby.  There are guns in the home (as in probably most Mississippi homes), but they are antiques and locked safely away.  Mrs. Parker is primarily a homemaker.
> (3) Shelby is six.  Her age poses no problem for the Parkers.
> (4) The Parkers are in their 50's and have good physical and mental health.  The Court is not concerned with Mrs. Parker's medication for depression based on hormonal changes.
> (5) The Court did not hear from Shelby, but the grandparents are attached to her.  Cards from Shelby, even if written by Laura, indicate a relationship.
> (6) There was no question presented as to moral fitness.
> (7) The Parkers live within 15 miles of the Woodells.
> (8) There is no evidence that the Parkers would undermine or interfere with the general discipline of the child; whereas, the Parkers indicate a willingness to work with the Woodells.
> (9) Mr. Parker is a self employed plumber.  Mrs. Parker is primarily a homemaker.
> (10) The Parkers' demeanor, as displayed from the stand, indicates that contact with them and Shelby would be in the child's best interest.  The Woodells seem intent on limiting contact with the Parkers and Andy, while allowing extensive contact with Laura; further, this appears more of an emotional repose to the deterioration of the relationship of the biological parents than something based on a definitive problem with the Parkers.

Thus, the chancellor did in fact properly analyze the facts presented under the *Martin* factors.  His findings are supported by substantial evidence in the record and should not be disturbed unless manifestly wrong or clearly erroneous neither of which apply here.  *See **Hollingsworth***, 609 So.2d at 424.

## V. WHETHER THE VISITATION GRANTED IS EXCESSIVE.

¶30. The Woodells argue that the visitation granted by the chancellor is excessive. They argue that three hours one day every month would be sufficient visitation and anything over such amount is excessive. However, in so arguing, the Woodells fail to challenge any of the chancellor's findings with regard to the *Martin* factors and only argue generally that the visitation was not in the best interest of the child and is excessive.

¶31. The chancellor, after applying the *Martin* factors, awarded the Parkers visitation consisting of one weekend a month, every other Spring Break/Easter holiday, the Friday and Saturday following Thanksgiving, the five days following Christmas, and two weeks during the summer. The chancellor also ordered that the Parkers should have reasonable telephone and postal access to Shelby.

¶32. In assessing and determining the visitation rights of the Parkers, the chancellor used the *Martin* factors and made specific findings of fact with regard to each. In fact, the Woodells do not contest these findings but merely assert that visitation is not in the best interest of Shelby and is excessive. Thus, we find that the visitation awarded by the chancellor was not excessive.

## IV. WHETHER THE WOODELLS WERE ENTITLED TO A DEPOSIT OF ATTORNEY FEES AND COURT COSTS PURSUANT TO MISS. CODE ANN. § 93-16-3 (4).

¶33. The Woodells argue that under Miss. Code Ann. § 93-16-3(4), they are entitled to attorney's fees. Section 93-16-3(4) states, in relevant part:

> The court shall on motion of the parent or parents direct the grandparents to pay reasonable attorney's fees to the parent or parents in advance and prior to any hearing, except in cases in which the court finds that no financial hardship will be imposed upon the parents. The court may also direct the grandparents to pay reasonable attorney's fees to the parent or parents of the child and court costs regardless of the outcome of the petition.

13

This Court has addressed an award of attorney's fees in domestic cases:

> An award of attorney's fees in domestic cases is largely a matter entrusted to the sound discretion of the trial court. *Poole v. Poole*, 701 So.2d 813, 818 (Miss. 1997); *Arthur v. Arthur*, 691 So.2d 997, 1004 (Miss. 1997). Unless the chancellor is manifestly wrong, his decision regarding attorney fees will not be disturbed on appeal. *Bredemeier v. Jackson*, 689 So.2d at 778. Absent an abuse of discretion, the chancellor's decision in such matters will generally be upheld. *Armstrong v. Armstrong*, 618 So.2d 1278, 1282 (Miss. 1993); *Martin v. Martin*, 566 So.2d 704, 707 (Miss. 1990); *Kergosien v. Kergosien*, 471 So.2d 1206, 1212 (Miss. 1985).

*Zeman v. Stanford*, 789 So.2d at 805. The Woodells provided no evidence tending to show any financial hardship. Therefore this assignment of error is without merit.

## CONCLUSION

¶34.    This case presents a non-traditional intra-family adoption consisting of complex relationships. The parties all know each other, and even the child is aware of the biological relationships she holds with each. The Parkers have clearly shown that they have established a viable relationship with the child and that they were unreasonably denied visitation by the Woodells. Using the principles and guidance of applicable law, the chancellor correctly found in favor of the Parkers as to visitation and granted their petition. Furthermore, the award of visitation was neither deficient nor excessive and is upheld. Under these facts, we affirm the chancellor's judgment granting the Parkers grandparents visitation.

¶35.    **AFFIRMED.**

**McRAE, P.J., COBB AND EASLEY, JJ., CONCUR. CARLSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, C.J., SMITH, P.J., AND WALLER, J. DIAZ, J., NOT PARTICIPATING**

**CARLSON, JUSTICE, DISSENTING:**

14

¶36.    Because the plurality affirms the chancellor's order granting grandparent visitation to Henry and Barbara Parker, I must respectfully dissent.

### A. Miss. Code Ann. §§ 93-16-3(2) and (3)

¶37.    "Natural grandparents have no common-law 'right' of visitation with their grandchildren. Such right, if any, must come from a legislative enactment." *Matter of Adoption of a Minor*, 558 So. 2d 854, 856 (Miss. 1990) (citing *Olson v. Flinn*, 484 So.2d 1015, 1017 (Miss. 1986)).  In 1983 the  Mississippi Legislature enacted the Grandparents' Visitation Rights Statutes, Miss. Code Ann. §§ 93-16-1 to -7. Miss. Code Ann. § 93-16-3 states in pertinent part:

> (2) Any grandparent who is not authorized to petition for visitation rights pursuant to subsection (1) of this section may petition the chancery court and seek visitation rights with his or her grandchild, and the court may grant visitation rights to the grandparent, provided the court finds:
>
> > (a) That the grandparent of the child had established a viable relationship with the child and the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child; and
> >
> > (b) That visitation rights of the grandparent with the child would be in the best interests of the child.
>
> (3) For purposes of subsection (3) of this section, the term "viable relationship" means a relationship in which the grandparents or either of them have voluntarily and in good faith *supported the child financially in whole or in part for a period of not less than six (6) months before filing any petition* for visitation rights with the child or the grandparents have had frequent visitation including occasional overnight visitation with said child for a period of not less than one (1) year.

(emphasis added). Section 93-16-7 states:

> This chapter shall not apply to the granting of visitation rights to the natural grandparents of any child who has been adopted by order or decree of any court unless: (a) one (1) of the legal parents of such child is also a natural parent of such child; or (b) one (1) of the legal parents of such child was related to the child by blood or marriage prior to the adoption. This chapter shall apply to persons who become grandparents of a child by virtue of adoption.

15

¶38. According to the statute, to prove a viable relationship existed, the Parkers must offer evidence regarding financial support of Shelby or frequent visitation. From the record, I find no compelling evidence that the Parkers offered any testimony of any financial support, much less that they had provided financial support for Shelby for a period of six months before the filing of their petition. The plurality incorrectly states that Andy and his parents sent money to help with Shelby's expenses; however, that money was only from Andy.

¶39. As to the frequent visitation requirement, the parties agree there has been no overnight visitation since 1998. However, the Parkers, through Andy's visitation, maintained a relationship with Shelby for over three years which exceeds the statutory requirement. The Parkers testified they regularly visited with Shelby during the first three years of her life. They also testified that this visitation included at least five or six instances of overnight visits. The Parkers do not disagree that the visitation decreased after Shelby's third birthday, but the Parkers maintain they were still able to see Shelby approximately every six weeks before the Woodells stopped visitation altogether in 1999.

¶40. The chancellor was correct in determining the Parkers established a viable relationship with Shelby through frequent visitations exercised by Andy. The visitation continued approximately three to four years. Although the overnight visits were contested by the Woodells and the chancellor never made a specific finding as to whether the overnight visitations occurred, the chancellor concluded that the Parkers had sufficient contact with Shelby for approximately three years. Although I agree with the chancellor that the Parkers had established a viable relationship with Shelby, the Parkers next had to prove whether they were denied reasonable visitation.

¶41. Sometime after Shelby's fourth birthday, the Woodells sharply limited Andy's visitation with Shelby. Andy was restricted to thirty minute visits, and finally, no visits at all. Mr. Parker testified that he attempted

16

to approach Mrs. Woodell about the visitation but was unsuccessful. After no attempts could be made to negotiate an agreement regarding visitation, the Parkers felt they had no other choice but to file their petition.

¶42.   From the record it appears that the Parkers never requested visitation of Shelby solely for themselves. Mrs. Woodell testified that, although she had one conversation with Mr. Parker concerning overnight visitation, the visitation request was for Andy. No requests for visitation were ever made by the Parkers when Andy was working out of state. There can be no unreasonable denial of visitation without a request.

¶43.   It is clear that the Parkers had grown accustomed to sharing Andy's visitation because Andy always brought Shelby home any time he was able to visit her. But it is not clear from the record that the Parkers made any effort to establish a visitation schedule of their own.   The chancellor made the following comments as to the unreasonable denial of visitation:

> a. The Parkers claim that they were denied visitation. Henry asserts that he talked with Mrs. Woodell about visitation and she never got back to him. Andy maintains that he wanted overnight visitation, that he threatened legal action, and that Mrs. Woodell told him visitation was not a good idea anymore.
>
> b. The Woodells contend that the Parkers never asked for visitation and Andy stopped asking.

Even if the Parkers did ask for visitation, the record shows they requested visitation only one time in 1999 and never requested again.

¶44.   Throughout his order, the chancellor focused considerable attention on the Woodells' adoption of Shelby and the rights of Andy as Shelby's biological father, although the sole issue was the Parkers' petition for grandparent visitation rights. The chancellor noted both biological parents were minors at the time of the adoption petition (Laura was 18, Andy was 20), the Parkers were not made aware of the adoption

when it was taking place, Andy was not represented by a guardian ad litem throughout this process, nor was process served on his parents.

¶45. Although both Andy and Laura were minors, they consented to the adoption pursuant to the statute. *See* Miss. Code Ann. § 93-17-5 (Supp. 2003).[4] Also according to Miss. Code Ann. § 93-17-5, it was not necessary to make the Parkers aware of the adoption. Although this Court has stated it is preferable for a guardian ad litem to be appointed in situations such as this prior adoption proceeding, it is not required. *See* **In re Adoption of a Minor**, 558 So. 2d 854, 857 (Miss. 1990). The Parkers express concerns that process was not served on them pursuant to Miss. R. Civ. P. 4. However, guidance can be found from the caveat contained in Miss. R. Civ. P. 81(a)(9), which provides that the Mississippi Rules of Civil Procedure have limited applicability in the actions described in Title 93 of the Mississippi Code, and that those actions are for the most part governed by statute. The last paragraph of Miss. R. Civ. P. 81(a) states that "[s]tatutory procedures specifically provided for each of the above proceedings shall remain in effect and shall control to the extent they may be in conflict with these rules; otherwise these rules apply." Therefore, I would find that the Woodells properly complied with the statute.

¶46. Although the validity of the adoption is not before this Court, it must be mentioned that the language added to the Affidavit signed by both Laura and Andy, "should we desire to adopt the minor child of this

---

[4]Miss. Code Ann. § 93-17-5 (1) states:

There shall be made parties to the proceeding by process or by the filing therein of a consent to the adoption proposed in the petition, which consent shall be duly sworn to or acknowledged and executed only by the following persons, but not before seventy-two (72) hours after the birth of said child: (a) the parents, or parent, if only one (1) parent, though either be under the age of twenty-one (21) years... [Note, the only difference in the current statute herein and the statute in effect at the time this case was tried is that in the current amended statute, the phrase "seventy-two (72) hours" has been substituted for the phrase "three (3) days."]

18

proceeding, SHELBY MARIE WOODELL, back in the future, that is entirely dependent upon whether or not the adoptive parents agree" is mere surplusage. *See In re Adoption of J.E.B.*, 822 So. 2d 949, 953 (Miss. 2002).

¶47. The Mississippi grandparents' visitation statute was designed to afford grandparents the rights to visitation. It was not designed as a means for parents to file suits for their children who no longer have parental rights. Andy was obviously denied visitation by the Woodells after he requested overnight visitation. But after he consented to the Woodells' adoption of Shelby, his rights as a parent were terminated. According to the laws of Mississippi, Carroll and Christine Woodell are the legal parents of Shelby. Although it may initially appear unfair that Laura is allowed to see Shelby on a regular basis while Andy may not, this arrangement seems to be evident of the true nature of the adoption.[5] We must urge our chancellors to closely examine these intra-family adoptions and their true underlying motives. This type of convoluted arrangement will continue to occur when family members adopt the children of other family members. What this Court must make abundantly clear is that an adoption decree is final, no matter what other promises may be made behind closed doors.

¶48. It is clear that the chancellor chose to remedy Andy's situation by awarding visitation rights to the Parkers. He relied heavily upon the fact that Shelby was allowed to spend a great deal of time with Laura instead of relying on the fact that the Parkers failed to meet the statutory requirements of section 93-16-3(2). But what I find most compelling is the fact that the Parkers relied solely on Andy's visitation to serve as their own. There is no evidence that either Mr. Parker or Mrs. Parker ever requested visitation on their

---

[5]Andy contends the adoption occurred only because the child needed extensive surgery which neither he, nor Laura could afford. Shelby was born with a bilateral cleft lip. Because Mr. Woodell was retired from the Air Force, the Woodells were able to obtain medical treatment for Shelby at Kessler Air Force Base. Mrs. Woodell testified Andy was unwilling to accept any of the responsibility involved in raising Shelby.

own behalf. Andy worked for long periods of time out of state, but the Parkers never requested visitation during those times when Andy was not at home. When the visitation decreased to only thirty minutes per visit which did not allow Andy the opportunity to take Shelby home for visits, the Parkers never approached the Woodells about visitation solely for their own benefit. It was not until Andy expressed concern and sought legal advice that the Parkers truly become involved.

¶49. It is my determination from the record that the Parkers are attempting to circumvent the adoption statutes by claiming their rights under the grandparents' visitation rights statutes only to provide their son, who no longer has any legal rights to this child, with visitation rights. Because the Parkers were unable to prove they were unreasonably denied visitation, they have failed to meet the statutory requirements of Miss. Code Ann. § 93-16-3(2). I would, therefore, reverse and render the chancellor's award to the Parkers of any and all visitation with Shelby.

### B. Deference to Parents' Determination of The Best Interest of The Child

¶50. Although I would find the chancellor erred in awarding grandparent visitation to the Parker's because they failed to meet the statutory requirements pursuant to Miss. Code Ann. § 93-16-3(2)&(3), I would also find that the chancellor abused his discretion in failing to give any consideration to the Woodells', as fit custodial parents, determination of what was in the best interest of their child. This issue has been addressed by the United States Supreme Court in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) and by this Court in *Stacy v. Ross*, 798 So. 2d 1275 (Miss. 2001).

¶51. In *Troxel*, the United States Supreme Court declared a "breathtakingly broad" Washington statute unconstitutional because it allowed courts to "disregard and overturn *any* decision by a fit *custodial parent* concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interest." *Troxel*, 120 S.Ct. at 2056 (emphasis in

original and emphasis added). The Supreme Court determined that the "Troxels did not allege, and no court has found, that Granville was an unfit parent. That aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children." *Id.* at 2061.

> The problem here is not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to Granville's determination of her daughters' best interests. More importantly, it appears that the Superior Court applied exactly the opposite presumption. In reciting its oral ruling after the conclusion of closing arguments, the Superior Court judge explained:
>
>> The burden is to show that it is in the best interest of the children to have some visitation and some quality time with their grandparents. I think in most situations a commonsensical approach [is that] it is normally in the best interest of the children to spend quality time with the grandparent, unless the grandparent, [sic] there are some issues or problems involved wherein the grandparents, their lifestyles are going to impact adversely upon the children. That certainly isn't the case here from what I can tell.
>
> Verbatim Report of Proceedings in *In re Troxel*, No. 93-3-00650-7 (Wash.Super.Ct., Dec. 14, 19, 1994), p. 213 (hereinafter Verbatim Report).
>
> The judge's comments suggest that he presumed the grandparents' request should be granted unless the children would be "impact[ed] adversely." In effect, the judge placed on Granville, the fit custodial parent, the burden of disproving that visitation would be in the best interest of her daughters. The judge reiterated moments later: "I think [visitation with the Troxels] would be in the best interest of the children and I haven't been shown it is not in [the] best interest of the children."
>
> The decisional framework employed by the Superior Court directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child.

*Troxel*, 120 S.Ct. at 2062.

¶52.   The plurality incorrectly argues that this case is distinguishable because the parties involved in *Troxel* were the natural mother, who was the custodial parent, and the paternal grandparents. In the case sub judice, the parties involved are Shelby's custodial parents, the Woodells, and Shelby's paternal grandparents, the Parkers. These are the same parties as were involved in *Troxel*. Shelby's biological

21

mother and biological father relinquished all legal rights to her when they signed an agreement allowing the Woodells to adopt Shelby. Again, this is the problem with intra-family adoptions. Although Shelby may still call her biological mother, "mom", her mother, pursuant to the laws of this State, is Christine Woodell, and her father is Carroll Dean Woodell. Therefore, *Troxel*, and its holding that custodial parents are presumed to be fit and will act in the best interest of their child, is directly on point, as the Woodells are Shelby's custodial parents. I respectfully believe the plurality is incorrect in stating otherwise.

¶53.    In *Stacy*, this Court reversed a chancellor's award of grandparent visitation because there was no finding that the visitation was in the best interest of the child. 798 So. 2d at 1282. This Court also discussed the fact that no finding had been made declaring the parents unfit. *Id.* at 1279.

> The constitutionality of any standard for awarding visitation "turns on the specific manner in which that standard is applied." *Troxel*, 120 S.Ct. at 2064 (emphasis added). As a strong presumption exists that fit parents act in the best interests of their children, the fact that there was no allegation and no judicial finding that the parents were unfit, was of great concern to the *Troxel* Court. *Id.* at 2061. No such finding has been made here either.

798 So. 2d at 1279. This Court cited *Troxel*, stating:

> The *Troxel* Court said "as long as a parent adequately cares for his or her child, (i.e., is fit) there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 120 S.Ct. at 2061. Whether it is beneficial to a child to have a relationship with a grandparent in any specific case, therefore, in the first instance is a decision for the parent to make, and when it becomes subject to judicial review, "the court must accord at least some special weight to the parent's own determination." *Id.* at 2062.

> In the case at hand, the Rosses have not alleged that the Stacys are unfit parents. Although the chancellor, in a subsequent judgment, commented that he had implicitly found the Stacys "unreasonably denied visitation," the Stacys have stipulated from the beginning that the Rosses have a "viable relationship" with Kevin and that they did not intend to permanently deny visitation with him. The Stacys argue, therefore, that as in *Troxel*, the chancellor's application of the statute overruled their decision as to what would be the appropriate visitation with the Rosses, giving no special weight to their determination as parents of what is in their child's best interest.

22

*Stacy*, 798 So. 2d at 1279-80.

¶54.    The chancellor made no finding that the Woodells were unfit custodial parents.  Mrs. Woodell

testified that if visitation were awarded, it should only be granted on a very limited basis. However, the

chancellor disregarded their wishes and what they believed to be in the best interest of Shelby and awarded

the Parkers excessive visitation.

¶55.    In the case sub judice, the Parkers argue the chancellor clearly found it was in the best interest of

the child to be allowed visitation with her grandparents. In the chancellor's order, he specifically stated:

> The Parkers['] demeanor, as displayed from the stand, indicate that contact with them and
> Shelby would be in the child's best interest. The Woodells seem intent on limiting contact
> with the Parkers *and Andy*, while allowing extensive contact with Laura; further, this
> appears more of an emotional response to the deterioration of the relationship of the
> biological parents than something based on a definitive problem with the Parkers.

(emphasis added). Unlike the chancellor in *Stacy*, this chancellor specifically found, according to statute,

that visitation with her grandparents would be in Shelby's best interest. But, like the chancellor in *Stacy*,

this chancellor made no specific finding, nor did the Parkers allege that the Woodells were unfit parents.

¶56.    Again, the chancellor's finding that visitation would be in the child's best interest focuses on Andy's

rights as the biological parent and Laura's extensive visitation which is allowed by Shelby's custodial

parents, and not on the fitness of the Woodells. The fact that seems to be forgotten throughout this entire

proceeding is that, although Andy was Shelby's biological father, he signed a document relinquishing all legal

rights to her. His rights, as he has none, should not have been addressed by the chancellor during these

proceedings.

¶57.    It was of great concern to both the *Troxel* Court and to this Court in *Stacy* that there was no

finding that the custodial parents were unfit parents. Because there is a presumption that fit parents act in

the best interest of their children, I would find that the chancellor erred in failing to give any consideration to the Woodells' determination of what was in the best interest of Shelby.

¶58.    The plurality specifically holds that *Troxel* and *Stacy* do not "stand for the proposition that 'adoptive parents' under the present circumstances receive deference with regards to their 'opinion' that visitation would not be in the best interest of the child or that the custodial parent must be found to be unfit before visitation is proper." (Plurality opinion at *10). With all deference, I firmly believe that this statement is not a correct statement of the holdings of these two cases. As previously stated, there is a presumption that fit custodial parents will act in their child's best interest. In *Troxel*, the Superior Court gave no special weight to Granville's, the child's mother and custodial parent, determination of what was in her daughter's best interest when it awarded the grandparents visitation. 120 S.Ct. at 2056. The Supreme Court declared that visitation award to be unconstitutional as it infringed upon the custodial parent's rights to make decisions in rearing her daughter. *Id.* The trial court in the case sub judice, likewise, afforded no special weight to what the Woodells believed to be in the best interest of their daughter. In *Stacy*, this Court determined a chancellor should not enter an order permitting grandparents visitation unless there is a showing of unfitness on the part of the custodial parents. "*Parents with custody* have a paramount right to control the environment, physical, social, and emotional, to which their children are exposed." 798 So.2d at 1280 (emphasis added).

¶59.    For the above-stated reasons, I respectfully, but vigorously, dissent.

**PITTMAN, C.J., SMITH, P.J., AND WALLER, J., JOIN THIS OPINION.**