BARNES, J.,
for the Court.
¶ 1. Willie Earl Lane (“Willie Earl”) appeals the judgment of the Madison County Chancery Court which set aside a conveyance of real property to Willie Earl on the grounds of undue influence. We find that the chancellor manifestly abused his discretion in finding that there was a confidential relationship between Willie Earl and the grantor, Willie Lane. Because there was no confidential relationship, no presumption of undue influence arose. Therefore, we reverse and render.
STATEMENT OF FACTS
¶ 2. Willie Lane died on April 7, 2002, at the age of ninety-five. Following his death, one of his daughters, Gertrude Henderson (“Henderson”), petitioned the Madison County Chancery Court to be appointed administratrix of Willie Lane’s estate and petitioned the court to grant letters of administration. Both petitions were granted. After being appointed as administratrix of Willie Lane’s estate, Henderson petitioned to set aside a conveyance of real property which Willie Lane *423 made to his son,[1] Willie Earl, prior to his death. The property in question is a 47.9 acre tract of land located in Madison County, Mississippi. Willie Lane conveyed this tract via quitclaim deed to Willie Earl on August 13, 1999, reserving in himself a life estate. In her petition, Henderson alleged that this conveyance was caused by undue influence which arose from a confidential relationship, that the conveyance should therefore be nullified and set aside, and that the property should be added to the hotchpot of the Willie Lane estate.
¶ 3. The issue of whether a confidential relationship existed at the time of the conveyance was tried before the chancery court on October 29, 2003. Both Henderson and Willie Earl testified at trial and, as may be expected, their testimonies sharply conflicted. Willie Earl testified that he had maintained a close relationship with his father throughout his life, and that he (Willie Earl) had always cared for and maintained the property in question, even when he was young. Willie Earl testified that, around the time of the property conveyance, his father “would always let me know what he was going to do.... He never done anything without me knowing about it.” Willie Earl admitted to driving his father to the doctor for periodic checkups and to “places to take care of his own business.” He noted, however, that his father nevertheless maintained his independence, even at a very advanced age. Willie Earl’s testimony reflects that, up until the age of ninety-four, Willie Lane was able to drive himself around town, was solely responsible for his personal finances, and was in generally good health, aside from a diagnosis of prostrate cancer in 1992. Uneontradicted testimony showed that Willie Lane moved in with Willie Earl on or about March 2000, apparently because Willie Lane’s house had burned down. From that point, Willie Lane was cared for by Willie Earl and his wife, Dorothy, until 2002 when Willie Lane was placed in a nursing home.
¶ 4. Henderson’s testimony was that Willie Lane came to her on or about April 2000, and stated that Willie Earl had “stole everything he had” including “everything in the bank” and “my land.” As to Willie Lane’s mental and physical condition, Henderson testified that he “couldn’t cook food for himself or nothing like that. If you prepared the food for him, he could fix a plate, like that. But when it c[a]me to washing his clothes, he had to have somebody to do that for him.” But she also testified that ever since she could remember, Willie Lane was able to go to the grocery store on a weekly basis.
¶ 5. The events surrounding the signing of the quitclaim deed and actual conveyance of the property on August 13, 1999, are unclear. Henderson and Willie Earl both seemed to agree that the deed was drafted and signed in the office of attorney George Nichols. Willie Earl testified that he was not present at the signing of the deed, but that he knew that his father was going to convey the property to him because his father had previously informed him of his intentions. However, in a previous deposition, Willie Earl stated that he had been present in the room with his father when his father signed the deed.[2] In Nichols’s pre-trial deposition, he admitted that he thought that Willie Earl had *424 provided the information to prepare the quitclaim deed.
¶ 6. Henderson’s testified that she learned of the conveyance in April 2000, when she was purportedly told by Willie Lane that Willie Earl had “stolen” his land. She then stated that, almost two years later, on February 12, 2002, she payed Nichols a visit and confronted him about the allegedly fraudulent conveyance. According to Henderson’s testimony, Nichols acknowledged to her that he had prepared the deed in question, and that he apologized to her for facilitating the transaction. Under Henderson’s version of the facts, Nichols told her that Willie Earl had told him that he was Willie Lane’s only heir, and that, based on this knowledge, Nichols agreed to draft the deed and supervise the conveyance.
¶ 7. Nichols and his secretary testified at trial. Both stated that they had absolutely no knowledge of the transaction in question. While they admitted, based on the signatures on the document, that the quitclaim deed was prepared by Nichols and signed in Nichols’s office, neither had independent recollection of the circumstances surrounding the transaction. Nichols did testify, however, to a rigorous procedure he follows for the preparation of any conveyance or will when an older and possibly less independent client is involved. When examined by Henderson’s counsel, Nichols denied having met with Henderson regarding the deed, and testified that he had no recollection of ever having met Henderson.
¶ 8. After hearing the testimony, the chancellor immediately issued a bench ruling. He found that Willie Earl and Willie Lane lived together for about three years, that Willie Lane was old, that Willie Earl took care of Willie Lane to some extent, that Willie Earl’s wife, Dorothy, cooked for Willie Lane and spent a lot of time with him when he lived with them, and that Willie Earl had a close relationship with Willie Lane. He also found that Willie Lane “knew what he was doing,” that he could still drive himself, that he “did his own stuff pretty well,” and that he was “physically strong and probably fairly mentally strong for a person of his age.... ” Based on these findings, the chancellor ruled that a confidential relationship existed between Willie Lane and Willie Earl. Having found a confidential relationship existed, the court then turned to whether Willie Earl had rebutted the presumption of undue influence with clear and convincing evidence. The Court found that Willie Earl did not rebut the presumption, primarily because he was not a credible witness.[3] Willie Earl timely appealed.
STANDARD OF REVIEW
¶ 9. We will not disturb a chancellor’s findings of fact unless the findings are clearly erroneous, manifestly wrong, or if the chancellor abused his discretion. Woodell v. Parker, 860 So.2d 781, 785(¶ 10) (Miss.2003). We will not reverse the ruling of the chancery court where the chancellor’s decision is based upon substantial evidence contained in the record. Norris v. Norris, 498 So.2d 809, 814 (Miss.1986).
ISSUE AND ANALYSIS
¶ 10. Willie Earl raises three issues on appeal. First, he argues that the chancellor erred in finding that a confidential relationship existed between himself and Willie Lane at the time of the conveyance *425 in question. Second, he argues that the chancellor erred by shifting the burden of showing that no undue influence existed at the time of the conveyance to him. Third, he argues that, even assuming a confidential relationship did exist, the chancellor erred in finding that he was not able to overcome the presumption of undue influence. Henderson contests each point, arguing that the chancellor properly found the existence of a confidential relationship, and that Willie Earl failed to overcome the resulting presumption of undue influence. We find that Henderson did not present clear and convincing evidence of the existence of a confidential relationship, and that the chancellor’s ruling therefore constituted manifest error.
¶ 11. Mississippi law clearly recognizes that “an inter vivos gift is a perfectly lawful means of transferring real property in this state.” Anderson v. Burt, 507 So.2d 32, 36 (Miss.1987) (citing Longtin v. Witcher, 352 So.2d 808, 810-11 (Miss.1977)). Gifts of real property between family members are a normal occurrence, and our courts will not act when a conveyance from a parent to a child is a purely voluntary act. Id. In fact, “[a] deed from a parent to a child alone and of itself raises no presumption of undue influence since, in the absence of evidence to the contrary, the parent is presumably the dominant party. This is true even though the parent is aged, or aged and infirm.” Thomas v. Jolly, 251 Miss. 448, 454-55, 170 So.2d 16, 19 (1964).
¶ 12. Our courts will act, however, if it is shown that a confidential relationship existed between the grantor and grantee at the time of the conveyance. Anderson, 507 So.2d at 36. The supreme court has stated:
Whenever there is a relationship between two people in which one person is in a position to exercise dominant influence upon the other because of the latter’s dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character.
Madden v. Rhodes, 626 So.2d 608, 617 (Miss.1993). “The party asserting that a confidential relationship exists has the burden of establishing such a relationship by clear and convincing evidence.” Foster v. Ross, 804 So.2d 1018, 1021(¶ 11) (Miss.2002); see also Holmes v. O’Bryant, 741 So.2d 366, 371(¶ 21) (Miss.Ct.App.1999) (clear and convincing evidence required to prove confidential relationship). If a confidential relationship is established by the moving party, a presumption of undue influence arises, and the burden shifts to the non-moving party to prove by clear and convincing evidence that the conveyance in question was not tainted by undue influence. Anderson, 507 So.2d at 36.
¶ 13. The court looks to a number of factors in determining whether a confidential relationship exists. These factors include:
(1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.
Wright v. Roberts, 797 So.2d 992, 998(¶ 18) (Miss.2001); In re Estate of Dabney, 740 So.2d 915, 919(¶ 12) (Miss.1999); In re Conservatorship of Moran, 821 So.2d 903, 906-07(¶ 16) (Miss.Ct.App.2002). In the instant case, the chancellor relied on these *426 factors in making his bench ruling. Specifically, the chancellor found that (1) Willie Earl and Dorothy took care of Willie Lane to some extent during the three years that Willie Lane lived with them, (2) Willie Earl and Willie Lane had a close relationship, (3) Willie Lane “could still drive his car and did his own stuff pretty well,” (4) Willie Earl and Willie Lane shared bank accounts, but that these were payable on death accounts, not joint accounts, (5) Willie Lane “was fairly physically strong and probably fairly mentally strong for a person of his age (6) Willie Lane was of an advanced age at the time of the conveyance, and (7) there was no power of attorney.
¶ 14. We believe that the key factor overlooked by the chancellor in his ruling was that Willie Lane did not move in with Willie Earl until March of 2000, months after the conveyance of the property in question, which took place on August 13, 1999. Much of the testimony elicited at trial concerned Willie Lane’s health and dependence after this transfer had already taken place. Clearly the question at trial should have been whether a confidential relationship existed at the time of the transfer, not. after the transfer had taken place. Since the fact that Willie Earl and Dorothy cared for Willie Lane during the three years that he lived with them is irrelevant in determining whether a confidential relationship existed at the time of the conveyance, we are left with little testimony that supports the existence of a eon-fidential relationship at the time of the transfer.[4]
¶ 15. The only factors remaining which support the chancellor’s decision that a confidential relationship existed were that Willie Earl and Willie Lane had a “close” relationship, and that Willie Lane was old. At trial, Willie Earl did testify that he and his father shared a close relationship, and that Willie Earl was responsible for maintaining the property in question. However, he stated that the relationship was that of a normal father and son, and quite correctly noted that any father and son should share such a relationship. There was no showing that this relationship was one where Willie Earl exerted a domineering influence over his father. Willie Lane did not move in with Willie Earl until March, 2000, and Willie Earl’s testimony that he cared for Willie Lane in such ways as driving him around town, buying groceries for him, and driving him to the doctor concerns this later period; not the time on or about August 13, 1999, when the deed was actually executed.[5] In fact, Willie Earl testified that Willie Lane voluntarily moved in with him because Willie Lane’s house burned down, not because Willie Lane required care. Dorothy’s entire testimony is relevant only to the approximately three years that Willie Lane lived in her home, a period after the conveyance had already occurred. No evidence was offered that Willie Lane depended on Willie Earl for necessities, that *427 Willie Earl was in a position of dominance, or that Willie Earl exerted undue influence over his father on or about August 13, 1999.
¶ 16. The only testimony offered by Henderson which concerned the time period prior to the signing of the deed, specifically, the time period following the death of Willie Lane’s wife in 1992, was her statement that:
When it came down to doing things for my father, my father couldn’t cook food for himself or nothing like that. If you prepared the food for him, he could fix a plate, like that. But when it c[a]me to washing his clothes or ironing his clothes, he had to have somebody to do that for him. But when it e[a]me to going to the grocery store, he was a person that, every [sic] since I can remember, even when my mother was living, my father went in the grocery store and made the groceries on a weekly basis....
This testimony, even when taken as true and uncontested, establishes only that Willie Lane may have needed the services of an assistant to prepare his meals and wash his clothes. There is no connection made that Willie Earl was the one supplying the assistance prior to March 2000, or that any assistance was even necessary, since Willie Lane could still drive himself around town to buy the things he needed. Given the dearth of testimony regarding Willie Lane’s dependence on others prior to March 2000, we must find that he maintained his independence at least up to that point. Ironically, Henderson herself vigorously contested that Willie Earl and his father ever shared a close relationship. This being the case, we presume that Willie Lane was still the dominant party at the time of the conveyance, and the “close” relationship between the two was not proven to be a confidential relationship which gives rise to a presumption of undue influence. See Thomas, 251 Miss. at 455-55, 170 So.2d at 19 (holding that a parent is presumed to be the dominant party, and mere gift from parent to child does not give rise to presumption of undue influence); Olmstead v. Olmstead, 233 Miss. 621, 628, 103 So.2d 399, 402 (1958) (holding that the mere existence of a parent/child relationship is not necessarily proof that a confidential relationship exists).
¶ 17. The fact that Willie Lane was old at the time of the conveyance is likewise insufficient standing alone to support the chancellor’s finding of a confidential relationship. The chancellor found that Willie Lane was strong mentally and physically, and that he was still self-sufficient and strong-willed in many respects, such as driving himself around town and managing his own money, even in the years that he lived with Willie Earl and Dorothy. Certainly these are not sufficient findings with which Henderson could meet her burden of proving a confidential relationship by clear and convincing evidence. These findings only establish that Willie Lane was an elderly man who, at the time of the conveyance, was mentally coherent, independent, in good physical health, and presumably still occupied the dominant position of “father” in his relationship with Willie Earl.
¶ 18. Aside from the chancellor’s findings that Willie Earl and Willie Lane had a close relationship, and that Willie Lane was old, the other findings of fact point toward the conclusion that a confidential relationship did not exist. The chancellor found that Willie Lane could drive himself and take care of himself well, that he was in good mental and physical shape, that he did not share bank accounts with Willie Earl, and that there was no power of attorney. The only other testimony which could bear on the chancellor’s decision was *428 the testimony offered regarding the events surrounding the actual conveyance.
¶ 19. The chancellor found, and we agree, that these events are a mystery. Willie Earl, in a deposition taken before trial, admitted that he was present in the room when his father signed the deed conveying the 47.9 acre tract, and even suggested that he had provided the information to attorney Nichols for the preparation of the deed. At trial, his testimony changed, and he suddenly denied having been present in the building when Willie Lane signed the deed. He also testified at trial that his father drove himself to attorney Nichols’s office, and that he only knew that his father was transferring the property to him because his father told him. Henderson denied that Willie Lane drove himself to attorney Nichols’s office, but offered no first-hand knowledge to support her claim. Attorney Nichols denied having any knowledge whatsoever of the transaction, and did not recognize or remember Willie Lane, Willie Earl, or Henderson. Henderson testified that she was unaware of the transaction until 2000, but then testified that the earliest time she took action and investigated was two years later when she purportedly confronted attorney Nichols. If we believe Henderson’s testimony that she took action in 2002 by confronting attorney Nichols about the transaction, her testimony conflicts with that of Nichols, who claimed that he had never met with Henderson regarding the deed and he did not recognize her. Willie Earl’s testimony is suspicious, but we must bear in mind that Henderson was required to carry the burden of proving a confidential relationship by clear and convincing evidence. Her contradicted testimony was simply insufficient to bolster Willie Earl’s witness stand-reformation to the level of clear and convincing proof of a confidential relationship. At best, she has merely proven suspicious circumstances.
¶ 20. We do not lightly disturb the efficacy of an otherwise valid deed. Anderson, 507 So.2d at 36. In the instant case, Henderson has failed to offer clear and convincing evidence that a confidential relationship existed at the time of her father’s conveyance of the 47.9 acre tract to Willie Earl. Because Henderson failed to meet her burden, we find that the chancellor abused his discretion in finding that a confidential relationship existed. We therefore reverse, render, and hereby set aside the order of the chancery court voiding the August 13, 1999, deed from Willie Lane to Willie Earl Lane.
¶ 21. THE JUDGMENT OF THE MADISON COUNTY CHANCERY COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR.

. Although she did not raise the issue at trial, Henderson’s pleadings indicate that she is contesting Willie Earl's status as an heir of Willie Lane, and therefore, impliedly, his status as Willie Lane’s son.

. This contradictory testimony weighed heavily in the chancellor’s decision.

. The chancellor stated, "Probably the clincher was that when Mr. Willie Earl Lane was being examined and questioned by [Henderson's attorney], his memory failed on almost every relevant question. But when he was being examined by his own lawyer ... his memory was much, much better.”

. Even absent the chancellor's error in determining the relevant time frame of the alleged confidential relationship, it does not appear that the chancellor placed a clear and convincing evidentiary burden on Henderson for determining that a confidential relationship existed. The chancellor correctly stated that Willie Earl had to overcome the presumption of undue influence by clear and convincing evidence but made no reference to the clear and convincing standard of proof required of Henderson to establish the existence of a confidential relationship in the first instance.

. Willie Earl testified that he took his father to the Veterans Administration when his father was ninety-three. Again, it appears that this would have occurred on or about the time that Willie Lane moved in with Willie Earl, since Willie Lane died in 2002 at the age of ninety-five.