IRVING, J.,
Dissenting.
¶ 22. The majority finds that because of the wide discretion given to chancellors in matters of grandparent visitation, we, as an appellate court, must affirm the chancellor’s decision to compel Kathryn, a child who will be sixteen years old on May 20, 2009, to have visitation with her maternal grandmother, Juanita H. Lewis. In my judgment, the record in this case demonstrates that the chancellor abused his considerable discretion. Therefore, I dissent. I would reverse and render the chancellor’s decision.
¶ 23. Before delving into the facts, I should point out that, even if I am mistaken in my view that the chancellor erred in requiring Kathryn to have visitation with her grandmother, a portion of the visitation order crafted by the chancellor must be reversed, because the order requires Pamela Ferguson, Kathryn’s mother, to share a meal with Kathryn and Juanita in the presence of one of Kathryn’s maternal great-uncles on the third Saturday of each month, beginning October 20, 2007, and continuing on the third Saturday of each month thereafter. I know of no authority that empowers a chancellor to order the parent to participate in the visitation between the grandparent and grandchild.
¶ 24. I now turn to the specific reasons why I believe the chancellor, though well intentioned, erred. It is well settled law in this state that in all matters involving a minor child, the polestar consideration is always the child’s best interest. In my judgnent, the determination of what is in the best interest of a child must always be guided by the specific facts of each case, not by the view that in every situation the best interest of the child requires that there be a harmonious and cohesive extended-family relationship. It seems to me that it is this latter view, rather than the former, that guided the chancellor’s deliberations.
¶ 25. Faced with a very articulate, intelligent, and focused child, the chancellor, in my view, decided that he had to find some way to discount the overwhelming and clear evidence of deep divisions and strong negative feelings attending Juanita, Pamela, and Kathryn’s relationship which suggests that forcing visitation between granddaughter and grandmother just may not be in the grandchild’s best interest. Therefore, the chancellor concluded that the grandchild, [Kathryn], was perhaps brainwashed. To be precise, the chancel *14 lor stated: “[Kathryn] was articulate and engaging for a child her age. Though the Court noted from her testimony that she was very much under the emotional and psychological influence of her mother, Pamela, almost to the point of being able to be said to have been brainwashed.”
¶ 26. Regarding the chancellor’s conclusion that it could be said that Kathryn had been brainwashed, Pamela’s attorney, in her motion for reconsideration, made a very poignant and, I believe, accurate observation:
The [c]ourt discounted [Kathryn’s] religious beliefs as “brainwashing” and took issue with her beliefs concerning her grandmother. Whether [Kathryn]’s beliefs represent ultimate truth in the heavenly realms is inconsequential to the fact that she indeed believes what she spoke about to the [c]ourt in chambers. This [c]ourt took issue with [Kathryn] and engaged in a heated debate with the child in a manner that resembled hostile adversarial cross-examination. In the end, [Kathryn] remained resolute in her belief that her grandmother had acted to inflict emotional pain on her and at this time she did not wish to visit with her grandmother.
I should also point out that, in my view, the chancellor, as wise as he may be, and notwithstanding his noble and good intentions, is not qualified to make the determination that Kathryn is brainwashed. He is neither a psychologist nor a psychiatrist. I believe that such a determination is best left to the experts who are schooled in such matters. That the chancellor, as the majority put it, “smelled the smoke of battle” does not mean that he, by that experience, was transformed to an omniscient, four-star general. Nor does it obligate us to abdicate our oversight responsibilities as an appellate court.
¶ 27. As I stated in the beginning of this dissent, the record speaks more eloquently than anything I have said or could say further in support of my view that the chancellor abused his discretion. Therefore, rather than attempt to characterize the testimony that was before the chancellor, I quote Kathryn’s in-chambers testimony, beginning with the direct examination by Pamela’s attorney:
Q. [Kathryn], will you state your full name.
A. [Kathryn].
Q. How old are you?
A. Fourteen.
Q. When is your birthday?
A. May 20th, 1993.
Q. And do you understand why we’re here at court today?
A. Yes. It’s because of my grandmother. She has wrongly accused my family, has hurt everyone in my family.
Q. Well, let me ask you this: Do you have — -how do you feel about seeing your grandmother right now?
A. Nervous[,] and I just don’t know what to say.
Q. Why do you think you’re nervous?
A. Because it’s just so weird to see her after what she’s done and how she’s hurt my family.
Q. How do — and I don’t want to upset you.
A. Oh, no.
Q. What do you think she’s done to hurt your family?
A. She has spoken lies about our entire family.
THE COURT: When you say your “entire family,” who are you including?
THE WITNESS: My cousins, my aunt, my uncle, my momma, all those people. And by hurting them, I feel like she’s hurt me.
*15 THE COURT: Okay. I’m sorry. Go ahead.
[PAMELA’S ATTORNEY]: That’s okay.
BY [PAMELA’S ATTORNEY]:
Q. There’s been testimony already about you seeing your momma at the mailbox — I mean your grandmother at the mailbox.
A. That’s right.
Q. Tell the judge what happened.
THE COURT: Excuse me. Do you want to come over here so you can see?
[JUANITA’S ATTORNEY]: I’m fine, Judge.
THE WITNESS: At the mailbox?
BY [PAMELA’S ATTORNEY]:
Q. Yes. Tell us about the visit at the mailbox.
A. All right. I was going to the mailbox one day, and my grandmother was driving by in the car. So I saw her, and she said, “Hey, [Kathryn], what are you doing?” And so I said, “I’m going to get the mail.” And so somehow she kept on talking and talking and talking, and we got into a conversation, and she said, “You know, your mother is mentally ill. Do you need me to take her to the doctor?” And I said, “No,” but I said, “Thank you, Grandmother. Thank you.” Because she said she’d be willing to take her to the doctor. So that’s what happened from there, and then she went home. So ...
THE COURT: What were you thanking her for?
THE WITNESS: I was just thanking her because she said she’d take Momma to the doctor. No, I didn’t think she needed to go to the doctor, but I really didn’t know what to say to her.
THE COURT: Okay.
THE WITNESS: So ...
BY PAMELA’S ATTORNEY:
Q. Did you cry after that visit?
A. I did cry in front of my mother. But Grandmomma’s like, I would never hurt you, I’d never do anything wrong to you. But, see, she already has. She’s already done the damage. I mean, if you hurt another family member, that’s doing damage to somebody else. So that’s pretty much that one little story.
Q. When did you become aware that your grandmother had conflicts with other members of your family?
A. When she tried to break in, and I’ve known it for a long time now. And' — •
Q. You’ve known it for a long time now. How did you know for a long time?
A. Just I’ve known because Momma and Grandmomma weren’t getting along and haven’t really gotten along. And I could just — something—I just could tell because when she tried to break into the house, she forced herself into the house, and she said she was going to call the police. And we had to — I told her, “Grandmother, I want nothing to do with you,” and we had to push her out of the house. She tried to force her way in. That’s— that’s what she did.
Q. What was your grandmother saying when she was trying to force her way in?
A. She said, “I’m going to — I’m going to call the police. I’m going to call the police.” And she also was going to try to call a family that we’re very, very close to, our spiritual family. She was going to call them and tell them that, you know — I don’t know what she was going to call them and tell them. It was just crazy. That *16 she was calling the police on us or something is what she was probably going to call and tell them.
Q. [Kathryn], do you love your grandmother?
A. Yes, I love her very much, and I’m praying for her salvation. But this really concerns me. I mean, if she’s hurting another family member, that is not good.
THE COURT: What do you mean when you say you’re praying for her salvation?
THE WITNESS: I’m praying that she will come to know the Lord.
THE COURT: How do you — she goes to the United Methodist Church.
THE WITNESS: I know, but that doesn’t make you a Chi’istian.
THE COURT: It doesn’t?
THE WITNESS: No.
THE COURT: What makes you a better Christian than your grandmother?
THE WITNESS: It’s not a matter of making you a better Christian than your grandmother. She just — we need to continue to pray for her salvation in this area and she — and come to see that she’ll know the Lord. Because what she has done, she has not—
THE COURT: Why do you think she doesn’t know the Lord?
THE WITNESS: Because she — a Christian would not be acting this way.
THE COURT: Christians act awful.
THE WITNESS: Christians act awful, but the way she’s acting is not right, and it’s not appropriate behavior for anyone. Because normally a grandmother—
THE COURT: But that doesn’t make her not a Christian, does it?
THE WITNESS: Well ...
THE COURT: Just because you act awful makes you not a Christian?
THE WITNESS: Well, it just — your actions speak louder than words, and
[[Image here]]
THE COURT: Do you think that you become a Christian or you maintain yourself as a Christian—
THE WITNESS: No—
THE COURT: —by your actions alone?
THE WITNESS: —you do not maintain yourself. You have got to ask the Lord into your heart and mean it and be sincere and truly mean what you say, and you need to live it out in what you do.
THE COURT: Right.
THE WITNESS: So ...
THE COURT: But if you don’t do that, does that make you not a Christian? Do you have to be perfect to be a Christian?
THE WITNESS: No, you do not have to be perfect to be a Christian. No. That’s not what it requires at all. Do you have a question?
[PAMELA’S ATTORNEY]: Did you have any more, Judge?
THE COURT: No.
BY [PAMELA’S ATTORNEY]:
Q. [Kathryn], do you think — let me just ask this final question:
A. Okay.
Q. Do you — right now do you want to have visitation with your grandmother?
A. No.
[PAMELA’S ATTORNEY]: I tender. That’s all I have. He may have questions for you.
THE WITNESS: All right. Sir?
CROSS-EXAMINATION BY [JUANITA’S ATTORNEY]:
*17 Q. [Kathryn], you said that it hurts you because of what your grandmother has [sic] spoken lies [about],
A. Yes, sir.
Q. Okay. What kind of lies has your grandmother told?
A. She has spoken that my mother is mentally ill.
Q. On the one occasion at the mailbox. Is that right?
A. At the mailbox it was because Mom was mentally ill. She was saying—
Q. No, wait a minute.
A. I’m sorry.
Q. She told — your testimony is that she told you that your mother is mentally ill — •
A. Yes, sir.
Q. —at the mailbox.
A. Yes, sir.
Q. And that was — when was that?
A. I don’t know how long ago that was.
Q. Well, it was long after Christmas, wasn’t it?
A. Right. Yes, sir. It might have been before Christmas. I really don’t know.
Q. Okay. You don’t remember. You just know—
A. I don’t remember.
Q. —it was when she was driving down the road—
A. Yes, sir.
Q. —and you were checking the mail?
A. Yes, sir.
Q. All right. And you think that’s a lie?
A. Yes, sir, it is.
Q. Okay. All right. What other lies has she told that hurt you?
A. She’s told my cousin that my cousin’s fat. She has gotten in [sic] any way that she can—
Q. Was that in your presence she told — ■
A. She told my cousin that in my presence, yes.
Q. Who is your cousin, now?
A. My cousin’s name is Rebecca, and she’s 20 or 21.
THE COURT: Yeah, we met Rebecca a few minutes ago.
BY [JUANITA’S ATTORNEY]:
Q. Okay.
A. That’s what she’s done. She speaks different lies, various lies, to different numbers of people in my family.
Q. Wdiat other lies? What other lies has — ■
A. Just everything she can think of. Anything and everything that she can think of.
Q. Everything she says is a lie?
A. Anything — -no, but when she thinks of something bad to say about somebody, she’ll tell them or she does it in private and doesn’t do it in front of people, but you still know .that she does it. So ...
Q. Okay. You’ve observed that, or is that something that somebody has told you? *
A. I know that for sure.
Q. Okay. You know, what — she told your cousin she was fat?
A. Yes.
Q. She told you that your mother was mentally ill?
A. Yes, sir.
Q. Okay. What other lies?
A. She has told my mother that she would give her property and—
Q. You heard her tell her this?
A. I have.
Q. Okay.
*18 A. And she did give us the property, gave us this house, and then she got mad at something Momma said to her — I can’t remember what it was— and she said she’d take the land away. So the thing with her is she was already upset by this time, and she told my cousin Rebecca and Karen that she would give them the land instead of giving us the land. So that was not right either.
Q. Okay.
A. There’s just so many things I probably couldn’t list them, but ...
Q. Okay. Was any of these things that your mother told you that [Juanita] said?
A. No.
Q. These are all things that you witnessed that your grandmother said?
A. Yes, sir. These are things that my grandmother said.
Q. Okay. That you heard your grandmother tell?
A. Yes, I heard my grandmother say this.
Q. Okay.
THE COURT: Where did you — where were you when you were around your grandmother and these other people when you overheard these comments?
THE WITNESS: One time I was at the mailbox when she said my momma was mentally ill.
THE COURT: Right. We’ve heard that.
THE WITNESS: I was at the mall with my cousin [and] my grandmother when I heard that[.] [S]he said that my cousin was fat. I was — where else was I? I can’t really remember where all.
THE COURT: When she made comments about or representations about giving you property—
THE WITNESS: Yes, sir.
THE COURT: —or taking it away, where were you when you heard that?
THE WITNESS: I think I was at my house when she said that.
THE COURT: At your house in Raymond?
THE WITNESS: I was at my house in Raymond.
THE COURT: And your grandmother was over there?
THE WITNESS: Yes, sir.
THE COURT: And who else was present?
THE WITNESS: My momma and me. Nobody else.
THE COURT: Okay.
BY [JUANITA’S ATTORNEY]:
Q. When was that? Do you recall when that was?
A. I cannot remember when that was.
Q. Was that before Christmas or after Christmas or ...
A. I don’t really remember right now.
Q. Okay. Well, that’s fíne. I’m not — if you don’t remember, you don’t remember.
A. Yeah.
Q. You said you love your grandmother.
A. I do.
Q. You spent a lot of time with her when you were growing up—
A. Yes, sir.
Q. —didn’t you?
A. Yes, sir.
Q. You went over to her house and spent the night?
A. Yes, sir.
Q. And rode the golf cart—
A. I did.
Q. —and flowers?
*19 A. I actually rode on the golf cart over at her house as a matter of fact.
Q. Did she ever let you drive it?
A. She did.
Q. Okay. All right. And you spent the night with her—
A. Yes, sir.
Q. —many times?
A. Yes, sir. When Granddaddy was alive, I did.
Q. Okay. And you went to Nashville with them during Christmas?
A. I did.
Q. Went to North Carolina with them?
A. I think so, yes.
Q. Okay. And did y’all have a good time?
A. I can’t really remember us going to North Carolina.
Q. Okay. But you remember going to Nashville?
A. I think so.
Q. All right. Do you remember going to Vicksburg park?
A. I do remember going there.
Q. Okay. Do you remember going to eat out in Vicksburg at restaurants?
A. I remember that, yes.
Q. Okay. Do you remember going to Bible school?
A. I did go to Bible school several times with Granddaddy.
Q. Okay. And did you go to church with your grandfather and grandmother?
A. I did, yes, sir.
Q. Okay. Now, did all this suddenly stop when your grandfather died or what—
A. It actually, I think, started when Granddaddy died.
Q. What started when Granddaddy died?
A. When she started saying my mother was mentally ill.
Q. Okay. So you think that’s — you think she didn’t talk bad about your mother until after Mr. Tip died?
A. Well, no. She did talk about her bad before Granddaddy died, but when she really started coming in saying she’d force her way into the house was after Granddaddy died.
Q. Okay. Well, that didn’t — I mean, when she talked about your mother before your Granddaddy died, apparently that didn’t bother you so much that you quit going over there, did it?
A. Well, no, I don’t think it did as much, but—
Q. Well, you were a little bit younger.
A. I was younger then, too, and I had my Granddaddy, and I was enjoying being with my Granddaddy. But then it just — you know, that happened. So
[[Image here]]
Q. Well, but you still did things with your grandmother, too, after your grandfather died?
A. Yes, sir, I did.
Q. Okay. That wasn’t — that didn’t cut you away from her—
A. Oh, no. No.
Q. —just because he passed away?
A. Oh, no. Unh-unh, no.
Q. Were you excited about moving to Raymond?
A. I was very excited. I thought we could be there, be by Grandmother. Since Granddaddy had died, we wanted to be there with her and help her and help the rest of the family.
Q. You’ve got a lot of other relatives—
A. Yes, sir.
Q. —that you visit with in Raymond when you’re with your grandmother, do you not?
*20 A. Well, I actually don’t. I visited my grandmother and Shelton Lee. And those were the two relatives I visited.
Q. I beg your pardon?
A. The two relatives that I visited were my grandmother and my imele, Shelton Lee.
Q. Right.
A. So ...
Q. Okay. Did you enjoy visiting at your grandmother’s house during Christmas holidays?
A. No, not at all.
Q. Not at all?
A. No.
Q. Never?
A. No. Not — not this year at all.
Q. No, I’m not talking about this year. I’m talking about in prior years.
A. Past years? Yes.
Q. Okay. It was just this year that — •
A. Yes, sir.
Q. —that was unpleasant for you?
A. Yes, sir.
Q. And that was because your mother was sick or there was conflict between your mother and your grandmother?
A. Because there was conflict between my mother and my grandmother.
Q. Okay. It wasn’t anything to do with you and your grandmother; it was your mother and your grandmother?
A. Yeah. And, actually, my momma was sick that day.
Q. Okay. Well, that’s — you know, that’s unfortunate. But she was ill—
A. Right. She was sick.
Q. • — and she didn’t want to eat with—
A. Yeah. She didn’t.
Q. —didn’t want to go over?
A. Unh-unh. (Negative)
Q. Okay.
[JUANITA’S ATTORNEY]: That’s all I’ve got, Your Honor.
EXAMINATION BY THE COURT:
Q. Do you have a green thumb?
A. I like to go outside and plant flowers. I like to do that.
Q. So you know what that means?
A. Yes, sir.
Q. Did you help your grandmother garden?
A. I did some. I helped her prune the roses and stuff.
Q. Do you enjoy that kind of thing?
A. Well, I haven’t now, but a long time ago I liked to help her. I’d ride around on the Club Car and help her. She would get the sprinklers out, and if she needed any help, I would help her dig — maybe dig some stuff, rake some pine straw back there on the property by my aunt, stuff like that, in the fall. So ...
Q. I’m asking you do you enjoy doing that kind of thing. Not have you done it lately but—
A. I do enjoy that. I like to plant flowers and stuff and rake.
Q. Do you like to be out — would you say that you like to be outside more or like to be inside?
A. I like to be outside when it’s pretty so I can walk and stuff like that.
Q. I do too. Do you — what is your favorite thing to do?
A. Read.
Q. Okay.
A. I love to read. History, biblical history.
Q. And you can do that wherever—
A. Every day.
Q. —you can take a book. Okay. What is your favorite subject?
*21 A. Spelling and reading and stuff like that. I don’t like math as much. So
[[Image here]]
Q. Okay. Let’s see. At 14 you would be in the equivalent of seventh grade?
A. Well, in home-school, we really don’t do grades, but I guess—
Q. That’s why I said the equivalent of.
A. The equivalent, yes, sir.
Q. You are passing through the subject area that a child might be expected to be exposed to in the seventh grade. Is that right?
A. I don’t know.
Q. You don’t know because you haven’t been in the seventh grade.
A. I don’t know since I haven’t been in public school. I’ve been home-schooled, so ...
Q. I hadn’t thought about that. So what kind of math is it that you do now?
A. I do multiplication, because math is really hard for me.
Q. Yeah.
A. And that’s what I do everyday. I have a tract that I put in that I do everyday, a math tract. And I listen to a CD and I do it. So ...
Q. And then in English, are you — what are you doing in the subject area of English?
A. In English? Let me think. I really don’t know. I don’t remember right now at this minute.
Q. Well, I mean, I know you’re probably nervous—
A. I’m trying to think.
Q. —in here.
A. I just can’t think of what we’re doing in English right now.
Q. Is it — well, what about your literature studies?
A. Literature, we do all types of different literature studies. We do language arts and history. Language arts and history. We do old geography, new geography, Old World from A Beka.
Q. A Beka?
A. From A Beka home-schooling.
Q. Oh.
[PAMELA’S ATTORNEY]: It’s a curriculum.
A. It’s a curriculum that we do. Well, we actually use several different cur-rículums. We don’t just stick to one; we use several different books, several different currículums.
BY THE COURT:
Q. Can you remember very much about going to Jackson Academy?
A. I do. I was real little. I was in— five — let’s see. Maybe I was. six, or second — let’s see. First grade — no— I think I was in first grade, or younger than that.
Q. Well, that was a long time ago. If you can remember that, that’s doing pretty good.
A. My teacher was Ms. Benton and stuff. That’s all I remember.
Q. That’s when y’all first moved back to Mississippi, wasn’t it?
A. Uh ...
Q. Or not long after. You were three years old when you moved back?
A. Well, yes, it had to be — it was probably after.
Q. You don’t remember much about Oklahoma City, do you?
A I really don’t. I really don’t. Other than it was during some of the- — some bombing of something—
Q. Oh, yeah.
A. —during the war, and my daddy went down there to help them, so ... *22 He wanted to help the Big Brothers and Big Sisters or whatever that is called. And he did that.
Q. Do you remember your father?
A. I really don’t.
Q. How did he die?
A. He died of a heart attack when I was three — two—I think two or three. I think I was two. I might not have been two. I might have been four or five. Right now I don’t really remember.
Q. Yeah. Okay. When you go over to— in times past when you’ve gone over to [Juanita’s]—
A. Yes, sir.
Q. What do you call her, by the way?
A. Grandmother, Grandmomma.
Q. Grandmomma. When you would go over to Grandmomma’s house, what did you do if you stayed inside?
A. I would just go in there and watch TV with Grandmomma. And sometimes if Grandmomma was inside, I’d just stay in there and watch TV while she went out in the garden. If it was too hot, I would stay inside, and then she’d come in. And then if it was a pretty day, maybe we’d go back outside and then we’d work in the yard. And that’s what we would do on a pretty day.
Q. And your uncle, Uncle—
A. —Shelton Lee?
Q. —Shelton would come over sometimes. Right?
A. He did. He’d come over all the time in the morning.
Q. What did you like to do with Uncle Shelton?
A. I just liked to talk to him.
Q. Yeah.
A. He just came over a lot. He came over in the nighttime and watched TV with us, and then he’d go home. Sometimes he’d go out to eat with us and stuff. So that’s what we did with him when he came over. He would come over to get his coffee in the morning. He came over there like, not first thing, but a few minutes after I’d wake up, he’d come over there and get coffee. That’s what he liked to do.
Q. Do you drink coffee?
A. I don’t. He’d drink it with my Grandmomma.
Q. Well, do you — when is the last time you’ve seen — what do you call him?
A. Uncle Shelton Lee.
Q. Uncle Shelton Lee? Boy, that’s a mouthful.
A. I saw him — well, I saw him today, of course. But the last time I saw him was maybe right before we moved, because the last day — the day we were moving, the day we had the movers in, Grandmomma came, and she said that she was coming to check on us. And she exploded because Momma wouldn’t tell her where we were going to move to. And she said, “Well, you’re going to know Grand-momma’s address, aren’t you? You’re going to know Grandmomma’s address.” Then she went out, was trying to ask all the movers where we were going to move to. Then she went out on the Club Car, and she left. And after that we had all of our stuff — we were trying to get all of our stuff moved out, and we were moved on that day.
Q. Did you think it odd in any way that your grandmother didn’t know where you were moving to?
A. Well, not really. I knew she could find a way — I knew she could find a way to find out where we were moving to. I thought that maybe she could *23 go to somebody and find out where we were moving to.
Q. Well, if she was going to find out, why not just tell her?
A. Well, because of all the trouble that she’s caused, I just wouldn’t feel right telling her that.
Q. Well, I didn’t mean you. I meant your mom.
A. My mom? She feels the same way about that, because we’re just — we were ready and — we were tired of her doing this and we were ready for her to stop doing this, if there’s any way.
Q. Doing what? I’m sorry.
A. Oh, that’s okay. To stop the abuse, the spying. She came over on her Club Car and was spying on us. She’d come over on her Club Car in the morning. I would see her Club Car on our property that she said she was going to give us, on that property. She’d just be on it all day, all day, just spying and spying, and we just got tired of that.
Q. Just like riding around and around the house?
A. Just riding around and around in a circle on the land because she was trying to see what we were doing. Because she sent — I don’t know if she sent somebody over or something the day we moved in and was just watching the entire time they brought the stuff in. So ...
Q. What about Uncle Shelton Lee, now? Has he ever been up to see you at your new house?
A. He actually has not seen me since then. The last day I saw him was when we moved from that house.
Q. Did you enjoy his company?
A. I did, but I did not enjoy it that day at all because he was — he was trying to be on her side and be—
Q. No, I’m just talking about generally when things were okay.
A. Normally? Yes, when my grandfather was alive, I did enjoy him coming over. I had fun with him. He was my favorite uncle that I knew the best of all of them, so ...
Q. Well, what about having Uncle Shelton Lee up for dinner one night or something?
A. I don’t think that would work because he is — I love him very much. He’s my favorite uncle. But he agrees with Grandmother in everything that she says and does. If she lies about somebody, he’ll be like, “That’s right, Nita. That’s right.” And he agrees with her, so I do not think that would be a very good idea. No, I do not want grandparents visitation rights.
Q. Well, he’s not your grandparent.
A. No, but I don’t want grandparents visitation rights.
Q. Okay. So you just — you just jumped to the ultimate question right there.
A. Okay. All right.
Q. So you don’t want—
A. Nothing — •
Q. —to see your grandmother?
A. Nothing to do with them. Nothing to do with any of them, any of the relatives, any of her relatives that we’re related to on that side. It’s not my uncle or anything.
Q. You know, now, [Kathryn], I’m just having a little trouble understanding why you would have such a strong opinion. I’m not saying that you don’t. I’m not questioning your feelings at all.
A. Oh, no.
*24 Q. I just am trying to understand why, why you do have such a strong feeling.
A. Just she’s hurt me from what she said, and words hurt. So if she said something to my momma — you know, what you say to your momma can hurt the child because the child belongs to the mother; and if you love the mother, that can hurt the child, whoever the child may be. That will — that might hurt them because it’s something that their grandmother’s done.
Q. Would you say that it is because of ways that your grandmother has hurt your mother more than ways that she has hurt you that you feel that strongly that you don’t want to see her?
A. I’m thinking it’s been something she said to my grandmother, and she would hurt my mother, but I don’t— she would hurt me, but I don’t think she would try to hurt me in the same way that she would hurt my mother. I don’t think that’s what her plan is at all.
Q. Okay. Well, of course, you’re only 14. You know, everybody has different relationships—
A. Yes, sir.
Q. —with everybody else. My relationship with my child is not the same as the relationship my wife has—
A. That’s right.
Q. —with my child. So everybody has to develop their own relationships. Can you ever see yourself having a relationship with your grandmother that doesn’t — that isn’t affected by your mother’s relationship with your grandmother?
A. I don’t really — no, I don’t — for right now, I don’t see it going toward that at all; but if the Lord saves her and completely changes her from how she’s been, I can see that maybe that might — that might just happen. But, really, right now I have no idea because I just don’t really know right now.
Q. Well, how would you know if the Lord made such a transformation?
A. Well, you can tell in them [sic] attitude.
Q. But, I mean, if you’re never around her, how would you know?
A. I just ...
Q. Is she supposed to send you a card in the mail that says The Lord has transformed me. Now I’d like to see you?
A. No. If I had been spending time with her or decided to spend time with her again, which I don’t really see happening right now, you would be able to tell by the way she acts, by the way she talks, the way she speaks, and just her actions would be completely different before she became a Christian.
Q. Okay. Well, let’s just assume — well, first of all, she is a Christian.
A. No, she’s not a Christian.
Q. Well, we—
[PAMELA’S ATTORNEY]: She believes that she is.
THE WITNESS: Right.
BY THE COURT:
Q. —we operate on a different premises on that, I guess.
A. Yes, sir.
Q. Because I don’t let anybody tell me that I’m a worse Christian than they are.
A. Right.
Q. And vice versa. You know, you shouldn’t do that either.
A. Yeah.
Q. That’s not our place.
*25 A. No.
Q. That’s God’s place.
A. That’s right.
Q. So you’re judging your grandmother on the basis of what kind of Christian she is when that’s not your role, nor is it any other living human being’s role.
A. Yes, sir.
Q. Okay?
A. Yes, sii’.
Q. All right. Now, here’s my question:
A. Okay.
Q. If your grandmother experienced the kind of transformation in behavior that you’re talking about you believe she needs to undergo, how would you know that she had unless you spend time with her?
A. Well, I don’t know unless I spen[d] time with her. If I spend time with her, I’ll know by her attitude, by her actions, how she speaks, how she thinks, how she acts.
Q. I know it, but how are you going to know all that if you’re not around her?
A. I don’t really know right now. I don’t really know, unless somebody else was with her and they [sic] could tell-
er Report back to you?
A. —her actions were different. Yes, sir. And maybe — I don’t know if I should say would tell me, but ...
Q. Well, can you think of anybody whose word on that point you would trust to report back to you about your grandmother’s change of disposition?
A. I can’t really think of anybody right now.
Q. So the only way you’re going to know is if you spend time around her. Right?
A. Yes, sir.
Q. That’s what it looks like to me.
A. Yes, sir.
Q. Okay. If you spend time around her, then, under what circumstances would you like for it to be?
A. Well ...
Q. And what I’m asking you is like where, who all would be there, what would y’all be doing, that kind of thing.
A. We might be at her house. It would be her, my uncle, if things get — if things got any better—
Q. Yeah.
A. —and things changed in attitude and action, how she acted and gave her life over to the Lord completely.
Q. Would you want to go to church with her and watch her walk down the aisle at the Methodist church to recommit herself to that way of life in order to be convinced about that?
A. Well, I don’t think so.
Q. Would you want her to go to your ' church?
A. No, because once you give your life to Christ, you give it to Him and you don’t just say that you’re going to do it and then you act, you know, crazy. I mean, just why would somebody try to break into your house? That does not—
Q. Well, that’s in the past, now. I’m talking about if we’re talking about a change in your grandmother.
A. Yes, sir.
Q. I’m looking forward not back.
A. Yes, sir.
Q. So I’m asking you how would you prefer to engage with your grandmother if she was willing to make this kind of change.
A. Well, I might spend time with her then. Church. When Granddaddy *26 was at church, he liked to talk to people, and he was a people person. He would introduce me to everybody at church. I had fun at church then. After Granddaddy died and Grand-momma just took me, I just didn’t have any fun anymore because ...
Q. This is the Raymond Methodist Church?
A. The United Raymond [sic] Methodist Church that we went to.
Q. Okay.
A. Because I just didn’t. I just felt — I mean, without my Granddaddy, Granddaddy was the one that introduced me to everybody. He knew everybody and was talking to everybody, and so that made me feel welcome. But Grandmomma and him were absolutely opposite of each other and do not have the same personalities at all. So that was something else too.
Q. Well, it sure is too bad that he passed away.
A. Yes. I loved my grandfather very much.
Q. What do you think your grandfather might think about the present state of affairs?
A. Well, he’s dead. He can’t — he can’t think about anything, so ...
Q. Well, you don’t know that, do you?
A. I mean, dead people—
Q. He might be listening to us right now.
A. Dead people don’t talk. I know that.
Q. I said what do you think he might think about the present state of affairs.
[PAMELA’S ATTORNEY]: If he were still alive today.
A. He would — he would tell my grand-momma to be quiet. And I’m serious. No, he would. I’m serious. He would tell her to be quiet.
BY THE COURT:
Q. Is he the only one that could have influence over your grandmother?
A. Probably so. And Shelton Lee. They both — she gets information from him. And the only reason she was giving the property to my aunt and younger cousin was because she didn’t want us having that house anymore. And so she was going to give us all the property that we had now, and she was going to give them — I think she was going to give them the house we were living in. And then she was going to give us her house arid ...
Q. Well, anyway—
A. That didn’t work out.
Q. Yeah. Well, would you be willing to spend the. night at your grandmother’s house and see for yourself whether she has experienced some sort of transformation of attitude?
A. I would not because I do not feel right being there in that house for some reason. And part of the reason is because what she’s done recently, and that was not long ago at all.
Q. Uh-huh. (Affirmative) What is that?
A. In trying to break in the house.
Q. Oh, okay.
A. With what’s going on with the property, saying that my momma was mentally ill. I mean, I just don’t want to spend time with somebody that’s going to do that.
Q. Okay. Have you ever spent the night at your Uncle Shelton Lee’s?
A. I have not. I’ve always been over there at Grandmomma’s and then he comes over.
Q. Does he have a wife and family?
*27 A. He actually is not married. So he comes over there with Grandmomma and talks to her, and they love to get out in the yard—
Q. Right.
A. —in the flowerbeds. That’s their life. They love gardening, and he sells day lilies and she sells flowers and stuff. So they — they love to get out in the yard when it’s pretty.
Q. Okay. All right. Well, let’s see, now. Do you go to school on Saturdays?
A. No.
Q. Y’all don’t do lessons on Saturday?
A. We don’t. Sometimes if I need to catch up in something, I will, or I do. But every other day of the week we do school. Sometimes when people have holidays — I do take off for Christmas, but other times, if I really need to catch up in school, I’ll be doing school while the other kids are doing their holidays at school, so ... And that doesn’t bother me at all, because if I need to catch up, I need to catch up. So ...
Q. Typically what do you do on Sunday? You go to church every Sunday?
A. Go to church and sometimes we go out to eat with our friends. Some of them are out there in the lobby.
Q. Some of your friends are down here?
A. Some of our friends are in there talking.
Q. Which of your friends are here?
A. Debbie Ruhl, Robin Powell, Renee Adams, and Vicki Demoney.
Q. Are these all children your age?
A. No. These are my momma’s friends. They’re much older. No, they’re not my age at all.
Q. All right. And where do all of those people live?
A. Debbie lives in Peach Orchard Drive. I think it’s Peach Orchard. Robin lives—
Q. Wait, wait, wait. Where is Peach Orchard Drive?
A. Peach—
Q. Do they live close to you—
A. I mean Peach Orchard Village.
Q. —in Madison?
A. They’re very — they’re very close. That’s why we moved there. We wanted to be by them. And Debbie is not far at all from the old — what was that place? — pottery, that old pottery place, Paint It My Way. Robin is in Trace Ridge, in that neighborhood in Madison. Renee, I don’t really remember where she is. And Vicki De-money is in Madison, too, and she’s not far from where we go to church at all. So it’s kind of like they’re all next to us, except Vicki’s not as next to us as Debra and Robin, because Debra and Robin are on this side, and here we are (demonstrating), and they’re— one’s maybe on the left and the right.
Q. Why are they down here today?
A. They’re here to represent us and to support us and be here with us today.
Q. Do they know your grandmother?
A. They do. Renee — Renee doesn’t and Vicki doesn’t, but Robin and Debbie do, and they have talked to her before.
Q. Okay.
A. So they’ve met her — actually, one of our friends that wasn’t here today— she had to work — her hus[band] — no, she gave my granddaddy a kidney. So she really became close.
Q. Oh, yeah. We heard about that. That’s a very loving thing to do.
*28 A. Yes, it is. She gave her kidney, gave her gift of herself in giving that kidney to my grandfather. And then he just didn’t make it and the kidney passed out. That’s what happened.
Q. Was it from complications of that transplant that he died?
A. Yes, sir.
Q. Okay.
A. It was because the kidney didn’t make it. The kidney failed. So that’s how he died.
Q. How long will it be, how much longer will it be before you can drive?
A. I don’t really know. We haven’t set a year yet.
Q. When is your — you’re going to be 15 next May 20th?
A. Yes, sil’. So I really don’t know when I’m going to get a driver’s license or anything.
Q. Is that important to you?
A. Not really, because, I mean, I’ve got so much to do. I just.... It’s not really. I haven’t thought about it.
Q. It’s not a priority with you—
A. No.
Q. —right now.
A. Not at all. Just getting this over with kind of is.
Q. Getting this right here over with?
A. Yes, sir. This over with.
Q. Well, what would you call “getting this over with” in a way that would please or satisfy you?
A. Well, I mean, it might not — just through harassment. I feel like it has been harassment. Has she been abusive? No, she’s not been abusive. She’s been abusive in words. She has not been slapping or kicking — well, she kind of did get aggravated and was kind of pulling on me, but it’s not like she was slapping me or kicking me or anything like that.
Q. And “she,” you’re referring to your grandmother?
A. Grandmother. Grandmother did that. But just the way she’s treated my family, the way she’s spoken about my family and acted about my family and treated my family.
Q. Did you speak to your grandmother down here today?
A. I actually have not spoken to her today. I saw her coming in, but I actually haven’t talked to her today. Actually, I haven’t talked to her since we moved yet, so.... But I know she’s in there. I saw her.
Q. Yeah. And you said you loved your grandmother.
A. I do very much. And just because I love her doesn’t mean I want her to do this to me, because that’s not— that’s not what a loving grandmother would do. Normally, if you were a loving grandmother, you would treat your grandchildren right, and you would love them and you would take care of them. And that’s not — that’s not the way she acts at all to me.
Q. Well, look, if you loved your grandmother—
A. Yes, sir.
Q. —and you hadn’t seen her in nine months—
A. Yes, sir.
Q. —and you lived 40 miles apart—
A. Yes, sir.
Q. ■ — and all of a sudden — this is a long-question—
A. Yes, sir.
Q. —and all of a sudden you find yourself in the same building—
A. Yes, sir.
Q. —by the same room—
*29 A. Yes, sir.
Q. —and you profess to love her—
A. Yes, sir.
Q. —-would you not want to speak to her?
A. No, sir. I just don’t feel like I should at this point, and I don’t think I should at any point. If it comes to be that she ever calls us, we would willingly be glad to come down there and take care of her, and—
Q. I thought you wanted her to leave you alone.
A. Ido.
Q. How is she supposed to know when to call you and when to leave you alone?
A. Well, just if she needed — -just if she felt like she needed to at any time, she could call us, and we would be glad— but we still would not let her control us and manipulate us and tell us what to do because that is not what a grandmother should do. That is not right any way for anybody, for any person.
Q. All right.
THE COURT: Well, I know everybody’s glad that I can’t think of anything else to ask you right now. Do either of you have any further questions for [Kathryn]?
[PAMELA’S ATTORNEY]: I don’t—
THE WITNESS: I don’t think so.
[PAMELA’S ATTORNEY]: He’s asking us.
THE COURT: I’m sorry. I’m asking the two lawyers do they have anything else they want to ask you.
[PAMELA’S ATTORNEY]: I don’t have anything else.
[JUANITA’S ATTORNEY]: Do you have anything?
[PAMELA’S ATTORNEY]: (Shakes head negatively)
FURTHER CROSS-EXAMINATION BY [JUANITA’S ATTORNEY]:
Q. You made — [Kathryn],. you made one comment about your Uncle Shelton Lee.
A. Yes, sir.
Q. And correct me if I’m wrong.
A. Oh, yes, sir.
Q. Did you say that he lied or that he was taking your Grandmomma’s side? Is that ...
A. He didn’t lie — well, I don’t know what he did, but he did take sides with my grandmother the day we moved. He got aggravated because Momma told Grandmomma that “You cannot control me anymore and you cannot take over what I’m doing.” So, of course, Shelton Lee got mad.
Q. Wait a minute, now. He got mad about what? What did Shelton Lee get mad about?
A. He got mad about what Grandmom-ma got mad about. And what Grand-momma got mad about is that she was not going to have control over us anymore.
Q. In other words, you think Shelton [Lee] wants your grandmother to have control over you? Is that what you’re saying?
A. I don’t think — well, yes, he probably does. Yes.
Q. All right.
A. Probably so.
[JUANITA’S ATTORNEY]: That’s all I want to know.
FURTHER EXAMINATION BY THE COURT:
Q. Well, it seems to me I’ve learned from this that you love your grandmother.
*30 A. Yes, sir.
Q. That you don’t really want to see her right now.
A. Yes, sir.
Q. But how you — what kind of relationship you have with her in future years, especially as an adult, if she lives that long—
A. Yes, sir.
Q. —is going to be dependent upon whether you allow her to be part of your life in some way.
A. Well, I just don’t see that happening right now.
Q. Well, when do you see that happening?
A. I really don’t know, to tell you the truth.
Q. Would you be sad if your grandmother died—
A. I would be very sad.
Q. —next week?
A. —but I just — I’m just so — she has hurt me so much since that has happened, since we said, “No, you’re not going to control our [lives] anymore.” And I just don’t see that happening any — anytime soon, no, sir.
Q. All right. Well, I doubt if your grandmother would want to have you down to her house or would want to see you if you didn’t want to be there and if you didn’t want to see her. Do you — do you think she would want to whether you wanted to or not?
A. Yes, sir, I do because I think that’s what type of person she is. That is what type of person she is. I know that from being around her.
Q. What pleasure would there be in being able to see you if she knew you didn’t want to?
A. There probably would not be any pleasure or there wouldn’t be because, you know, what she’s already done.
Q. She’s a sadist [sic] or masochist [sic]?
A. No, she’s not a Satanist, but—
Q. Masochist. I’m sorry. Somebody that likes to inflict punishment or harm to themselves [sic].
A. Yes. She is causing all this harm.
Q. She may be. I don’t know. I don’t know your grandmother well enough to know. You know her better than I do. Okay. Well, it’s a terrible situation. I’m very saddened by this.
A. Thank you.
Q. I’m sad for you and I’m sad for your grandmother.
A. Yes, I’m very sad for my grandmother.
Q. And I’m sad for your mother.
A. Thank you.
Q. All right. Well, I tell you what we’ll do — were you in one of the witness rooms?
A. I was.
Q. By yourself?
[PAMELA’S ATTORNEY]: She was sitting on the bench.
THE COURT: Okay. Well, look, we’ll let you go back out there to that. That middle door will put you right back out there. And I appreciate you talking to me today.
THE WITNESS: Thank you so much.
THE COURT: It’s nice meeting you.
[JUANITA] [sic]: Nice to meet you.
THE COURT: You’re a sweet little girl—
THE WITNESS: Thank you.
THE COURT: — and it’s a pleasure meeting you.
THE WITNESS: Thank you.
*31 ¶ 28. In addition to Kathryn’s testimony, it appears to me that Pamela gave testimony that was relevant to the issue of Kathryn’s best interest. Therefore, I summarize the relevant portions of Pamela’s testimony. Pamela testified that she does not suffer from bipolar disorder and that she never told Juanita that she does. Pamela stated that she and Juanita have a history of conflict and that things escalated after Christmas 2006. Pamela recalled that shortly before Christmas 2006, when she was ill with bronchitis, Juanita called her five or six times in one day. Pamela stated that during one conversation, Juanita accused her of being mentally ill and stated that she never wanted to speak to her again. Pamela testified that she then informed Juanita that she would no longer allow her to control her life. Pamela also testified that she refused to allow Juanita to have contact with Kathryn from that point forward. Pamela further testified that “Momma has had a patternf.] [I]f she can’t control, she’s out to destroy. I’ve seen her do it with my sister, with Rebecca, with Sam.[7] And, you know, I just decided I’m 45 years old and I don’t have to go through this.” (Footnote added).
¶ 29. Pamela also testified that Kathryn has been on an emotional roller coaster ever since the mailbox encounter with Juanita, even though at one point Kathryn and Juanita had a close relationship. She testified that she does not feel that it is in Kathryn’s best interest to have visitation with Juanita because of the emotional toll that contact with Juanita has on Kathryn.
¶ 30. It is well-settled law in this State that “the polestar consideration in child custody cases is the best interest and welfare of the child.” Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). While this case involves an issue of a grandparents’ visitation rights rather than an issue of parental custody, the best interest of the child remains the central focus. See Woodell v. Parker, 860 So.2d 781, 788(¶ 28) (Miss.2003) (quoting Martin v. Coop, 693 So.2d 912, 916 (Miss., 1997)).
¶ 31. The Mississippi Supreme Court has held:
Section 93-16-3(2)(b) requires the trial court in determining whether grandparents visitation should be granted to assess whether “visitation rights of the grandparent with the child would be in the best interest of the child.” Miss. Code Ann. § 93-16-3(2)(b). There is no language in the statute suggesting that the custodial parent’s opinion with regard to what is “in the best interest of the child” is to receive some sort of “deference” or that findings as to the fitness of a parent are to be made. However, under applicable case law, we find that “deference” is afforded to the opinion of a “natural parent” involved in a visitation dispute wider this nature.
Woodell v. Parker, 860 So.2d 781, 787(¶ 22) (Miss.2003) (emphasis added). Further, in Stacy v. Ross, 798 So.2d 1275, 1280(¶23) (Miss.2001), the Mississippi Supreme Court also stated:
We view our statute as requiring no less than the Fourteenth Amendment in this regard. The determination whether parents are unreasonable in denying visitation in whole or part to grandparents is not a contest between equals. Parents with custody have a paramount right to control the environment, physical, social, and emotional, to which their children are exposed. See Plaxico v. Michael, 735 So.2d 1036 (Miss.1999); McKee v. Flynt, 630 So.2d 44 (Miss.1993); Carter v. Taylor, 611 So.2d 874 (Miss.1992); Ethredge v. Yawn, 605 *32 So.2d 761 (Miss.1992); White v. Thompson, 569 So.2d 1181 (Miss.1990); Simpson v. Rast, 258 So.2d 233 (Miss.1972); In re Faust, 239 Miss. 299, 123 So.2d 218 (1960). Interference with that right based upon anything less than compelling circumstances is not the intent of the visitation statute. Clearly, forced,, extensive unswpeiwised visitation cannot be ordered absent compelling circumstances which suggest something near unfitness of the custodial parents.
(Emphasis added).
¶ 32. The chancellor granted the following visitation:
(1) On Saturday, October 20, 2007, and on the third Saturday of each month hereafter, the Respondent, Pamela L. Ferguson, and her minor child, [Kathryn], shall be available unto Petitioner, Juanita H. Lewis, for either the noon or evening meal, said meal to be provided by Petitioner, at Petitioner’s expense, and said meal to be held in the presence of Shelton Lee Holiday, the maternal [great-]uncle of the minor, it being the intention of this order that [Kathryn], Pamela L. Ferguson, Juanita H. Lewis and Shelton L. Holiday shall share a meal on at least one weekend per month, at a location agreed upon by the parties.
(2) That the Respondent, Pamela L. Ferguson, shall deliver the minor child, Kathryn Ferguson, to the residence of Juanita H. Lewis by 4:00 p.m. on Christmas Eve (December 24th), beginning Christmas Eve, 2007 and at the same time and on the same day of each year thereafter. The said minor child may be picked up from such visitation (in the event that Pamela L. Ferguson chooses not to stay) at 8:00 p.m. that evening.
(3)That the Respondent, Pamela L. Ferguson, shall deliver the minor child, [Kathryn] Ferguson, to the residence of Juanita H. Lewis by 6:00 p.m. on the second Saturday of June each year and by 6:00 p.m. on the second Saturday of July each year and that Juanita H. Lewis shall be allowed to visit with said minor child for a period of one week on each occasion, unless Juanita H. Lewis and Pamela L. Ferguson agree upon a different weekly schedule during the summer months, or at another point in the year, beginning in June and July, 2008.
¶ 33. Taking into consideration the testimonies of both Kathryn and Pamela, I would find that substantial evidence does not exist on these facts to support the chancellor’s findings that it is in Kathryn’s best interest that visitation be granted to Juanita and “that Pamela’s conduct in denying [Juanita] the opportunity to see and visit with Kathryn constitutes an unreasonable denial.... ” Accordingly, I would find that the chancellor abused his discretion and reverse the chancellor’s judgment awarding grandparent visitation rights to Juanita and would render judgment in favor of Pamela.
LEE, P.J., AND ROBERTS, J., JOIN THIS OPINION.

. Rebecca and Sam are Juanita's grandchildren by her daughter, Karen.